**In re PETsMART, INC. SECURITIES LITIGATION.**

**No. CV 98–0020PHXROS(JMB).**

United States District Court,
D. Arizona.

May 28, 1999.

Andrew S. Friedman, Francis J. Balint, Jr., Christina L. Bannon, Bonnett, Fairbourn, Friedman, & Balint, P.C., Phoenix, AZ, Robert Ira Harwood Halebian & Feffer LLP, New York, NY, for Plaintiffs.

Hal Michael Clyde, Rebecca K. Barnes, Jessica L. Everett–Garcia, Brown & Bain, P.A., Phoenix, AZ, Stephen C. Neal, Vincent A. Colianni, Bryan W. Dawson, Cooley Godward, LLP, Palo Alto, CA, for Defendants.

## MEMORANDUM AND ORDER

MORAN, Senior District Judge.

Plaintiffs bring this suit against PETsMART, Inc. and four of its officers, Samuel J. Parker, Mark S. Hansen, C. Donald Dorsey, and Susan C. Schnabel (collectively defendants), on behalf of all persons who purchased or acquired common stock and options during the period beginning May 20, 1996, and ending July 21, 1998. Plaintiffs allege that the defendants materially misrepresented PETsMART's financial status in order to artificially inflate the price of PETsMART's stock, in violation of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (SEA or Exchange Act), and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1996), promulgated thereunder. Defendants have moved to dismiss the complaint for failure to state a claim and for failure to plead claims of fraud with sufficient particularity. For the reasons set forth below, defendants' motion is granted.

## BACKGROUND

When deciding a motion to dismiss we accept all material allegations of fact as true and must construe those allegations in the light most favorable to the nonmovant. *Parks School of Business, Inc. v. Symington,* 51 F.3d 1480, 1484 (9th Cir.1995). Read in this light, the facts are as follows.

Defendant PETsMART is a worldwide operator of retail "superstores" specializing in pet food, supplies, and services. (CAC ¶ 41). During the past decade, PETsMART has experienced tremendous growth, expanding from two superstores in 1988 to 384 in North America as of February 1998. (plf. memo in opp. at 4; CAC ¶¶ 41, 159). The company first entered the mail order catalog business in April 1995 and within three years had proclaimed itself the "leading direct marketer of pet and equine supplies through direct mail." (CAC ¶¶ 46, 127). The company maintains a site on the Internet where it "disseminates material information about the Company, its products, and its financial condition to customers, vendors, and the investing public." (CAC ¶ 24). Three particular components of PETsMART's business come under fire in plaintiffs' complaint: pet supplies, catalog operations, and veterinary services.

### a. Pet Supplies

PETsMART's sale of "pet supplies"—including collars, leashes, toys, flea and tick treatments, and other health aids, shampoos, and medications—reportedly accounted for approximately 42.1% of company revenues in 1997. (CAC ¶ 42b). Plaintiffs allege that defendants inadequately responded to changes in the market for over the counter flea and tick products, including flea collars, shampoos, powders, dip, sprays, indoor foggers, and backyard sprays. (CAC ¶ 64). Because flea and tick infestation is heaviest in the

spring, the products enjoy a highly concentrated selling period, resulting in fewer discounts and higher gross margins.

In November of 1994, the Federal Drug Administration approved Ciba–Geigy's new flea prevention treatment known as "Program" and the prescription-only tablet therapy hit the market in early spring 1995. (CAC ¶ 66). The active ingredient in the tablets, Lufenuron, breaks the flea life cycle by preventing eggs from developing into mature adults. According to plaintiffs, the new therapy "was considered effective, nontoxic, and environmentally safe and had already revolutionized flea treatment in the United Kingdom." (CAC ¶¶ 65, 66). In November 1996, Bayer introduced a topical liquid version of the medication, called "Advantage," which is absorbed into a pet's blood system through the pores of the skin. (CAC ¶ 67). Advantage was also dispensed only by prescription. Plaintiffs infer that defendants were aware of these products during the class period because 50% of PETsMART superstores sublet space to veterinarians as of the spring of 1996. (CAC ¶ 69).

The complaint alleges that the new therapies rendered PETsMART's inventory of over-the-counter flea and tick products obsolete and unsalable during the class period. (CAC ¶ 141). "As of the date of filing of PETsMART's Fiscal 1997 Form 10–K," plaintiffs allege, "the Company's sales of flea control products in the U.S. were down approximately 18% from the prior year, and in California and Florida, they tumbled by up to 40%." (CAC ¶ 141d). Plaintiffs charge that defendants should have warned the market about the competitive therapies and adjusted the financial statements to reflect the devalued inventory.

### b. Catalog Operations

On April 4, 1995, PETsMART announced that it would enter the catalog business with its acquisition of New York-based Sporting Dog, "the leading worldwide catalog retailer of pet and animal supplies and accessories." (CAC ¶ 44). Sporting Dog distributed five catalogs, *R.*

*Steele, Wiese Equine Supplies, Pedigrees, Groomer Direct,* and *Aquarium Suppliers,* and operated five retail stores in upstate New York. *Id.* In January of 1996, PETsMART purchased two more catalog companies, New Hampshire-based State Line Tack and Tennessee-based National Bridle. (CAC ¶ 45). In October 1996, PETsMART started its own direct mail division called PETsMART DIRECT, and has at times used its catalogs to promote PETsMART retail outlets. (CAC ¶ 58b).

Prior to their acquisition by PETsMART, Sporting Dog and State Line Tack both collected and remitted sales and use taxes in the states in which they had a presence. (CAC ¶¶ 53, 54). According to the complaint, PETsMART discontinued the collection of these taxes despite "direct knowledge" that this was in violation of state law. (CAC ¶ 60). No reserve was created to cover the taxes allegedly owed by PETsMART to Arizona, Texas, and California, or to other unspecified states.

The catalog operations were the subject of corporate optimism throughout the class period. (CAC ¶¶ 82, 90, 94, 124, 127). In PETsMART's fiscal 1996 10–K filed with the SEC on April 6, 1997, and signed by defendants Parker, Hansen, and Schnabel, the company attributed its improved profit margins, in part, to "improved margins in catalog operations." (CAC ¶ 90). A year later, the financial reports were not as rosy, but the company continued to promote its mail order business. The fiscal 1997 10–K filed with the SEC on April 6, 1998, noted that PETsMART DIRECT had circulated more than 37 million copies of seven different catalogs and had developed a sophisticated, proprietary database of existing and potential customers. (CAC ¶ 127).

Defendant Parker assumed responsibility for the catalog division in May of 1998. (CAC ¶ 130). Shortly thereafter, on May 27, 1998, PETsMART announced that PETsMART DIRECT recorded sales of $25.7 million for its fiscal 1998 first quarter ending May 3, 1998, as compared to $28.3 million for the same quarter in 1997.

(CAC ¶ 131b; def. docs at P). The announcement explained that "PETsMART DIRECT's performance reflects our planned reduction in catalog circulation versus last year." *Id.* Plaintiffs charge that defendants should have disclosed earlier "that PETsMART was in the process of substantially reducing or eliminating the Company's catalog business" and the failure to do so contributed to defendants' fraud on the market. (CAC ¶¶ 125, 128; plf. memo in opp. at 7).

### c. Veterinary Services

■ Plaintiffs allege that PETsMART's decision to lease space within 176 of its retail stores to independently-owned-and-operated veterinary clinics had adverse consequences that were not disclosed to investors. (CAC ¶¶ 93, 143). The complaint provides little information on this score but hints that prescriptions written by in-store veterinarians contributed to declining flea and tick sales. The complaint also points to PETsMART's relationship with MMI, its "largest licensee." (CAC ¶ 144, citing report by William Blair).[1] PETsMART reportedly had an ownership interest in MMI and guaranteed its obligations under an equipment financing lease. (CAC ¶ 144). Plaintiffs charge that PETsMART and MMI were by law "related parties" and, consequently, all material transactions between the two should have been disclosed to investors. (CAC ¶ 147).

The CAC names four individual defendants. After serving as president and chief executive officer of PETsMART, Samuel Parker became chairman of the board in 1993 and held that position throughout the class period. (CAC ¶ 25). In January 1997, Parker resigned as an employee of the company, but continued to serve as its chairman. On June 13, 1997, Parker returned to the company as CEO and held that position until May of 1998 when he assumed "direct" responsibility for PETsMART DIRECT. Defendant Mark S. Hansen joined the company in December 1989 as senior vice president. (CAC ¶ 26). He was appointed president and elected CEO on June 19, 1995, and held those positions until June 13, 1997, when he resigned from the company. Donald Dorsey joined the company in March 1989 as senior vice president and chief financial officer. He was elected executive vice president in January 1994. Dorsey resigned as chief financial officer in February 1997, but continued to serve as an executive officer through the close of the class period. (CAC ¶ 27). The fourth defendant, Susan C. Schnabel, served as senior vice president and chief financial officer from February 1997 to November 25, 1997. (CAC ¶ 28). Each defendant signed at least one quarterly report filed with the Securities and Exchange Commission (CAC ¶¶ 25c, 26b, 27b, 28b), and is alleged to be a controlling person of PETsMART within the meaning of Section 20(a) of the Exchange Act. (CAC ¶ 29).

### ANALYSIS

Plaintiffs allege in count I that the PETsMART defendants, individually and in concert, violated Section 10(b) and Rule 10b–5 when they failed to warn the market about the adverse effects of new flea and tick therapies, failed to appropriately write-down obsolete inventory, recklessly ignored advice regarding mounting sales tax liability from the company's catalog operations, failed to sufficiently disclose relationships with in-store veterinary clinics, and provided a series of optimistic

---

1. A court may take judicial notice of matters of public record outside the pleadings without converting a motion to dismiss into a motion for summary judgment. *MGIC Indemnity Corp. v. Weisman,* 803 F.2d 500, 504 (9th Cir.1986). On December 16, 1998, we ruled that the reports of financial analysts would not be considered for the truth of the matters stated. But such reports, press releases, and SEC filings have been considered where defendant uses them to establish whether and when certain information was provided to the market. We have also considered the substance of SEC filings regarding stock sales by PETsMART officers because plaintiffs rely upon those same reports and they are central to plaintiffs' allegations of an intent to defraud. *Branch v. Tunnell,* 14 F.3d 449, 453–454 (9th Cir.), *cert. denied,* 512 U.S. 1219, 114 S.Ct. 2704, 129 L.Ed.2d 832 (1994).

statements to the market which misled investors and caused them to buy PETs-MART stock at artificially inflated prices. In count II, plaintiffs allege that the individual defendants, as controlling persons, violated Section 20(a) of the Exchange Act. Defendants have moved to dismiss based on plaintiffs' failure to meet the pleading standards for securities fraud established by the Private Securities Litigation Reform Act of 1995, Pub.L.No. 104–67, 109 Stat. 737 (codified as amended in scattered sections of 15 U.S.C. (Supp. II 1996)) (Reform Act or PSLRA), for failure to plead with the particularity required by Federal Rule of Civil Procedure 9(b), and for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

## I. Pleading Standards under the Federal Rules and the PSLRA

To state a claim under § 10(b) and Rule 10(b)–5, a plaintiff must allege (1) a misrepresentation or omission, (2) a purchase or sale of a security therewith, (3) scienter, (4) materiality, (5) justifiable reliance, and (6) damages. *Marksman Partners, L.P. v. Chantal Pharm.*, 927 F.Supp. 1297, 1303 (C.D.Cal.1996). Generally, plaintiffs in federal court are required to give a short plain statement of the claim which is sufficient to put the defendant on notice. In an action for securities fraud, however, plaintiffs must clear additional hurdles at the pleading stage before they are given access to the tools of discovery. First, Federal Rule of Civil Procedure 9(b) requires that "the circumstances constituting fraud or mistake shall be stated with particularity." Courts in this circuit have consistently held that Rule 9(b) requires the inclusion of specific facts regarding the fraudulent activity such as the time, dates, places, content of the alleged fraudulent representation, why or how the alleged

fraudulent representation is false, and, in some instances, the identity of the person engaged in the fraud. *See, e.g., In re GlenFed, Inc. Securities Litigation*, 42 F.3d 1541, 1547–49 (9th Cir.1994). Additionally, under the PSLRA, plaintiffs must plead "each statement alleged to have been misleading, and the reason or reasons why the statement is misleading." 15 U.S.C. § 78–u4(b)(1)(B).

Although pleading securities fraud after the PSLRA can no longer be described as merely "notice pleading," courts must be careful not to set the hurdles so high that even meritorious actions cannot survive a motion to dismiss. Such a regime would defeat the remedial goals of the federal securities laws. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 200, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Rehm v. Eagle Finance Corp.*, 954 F.Supp. 1246, 1252 (N.D.Ill.1997). Finally, we note that Rule 12(b)(6) standards are also applicable here. If pleading requirements are met, the complaint will be dismissed "only if it appears beyond a reasonable doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

### a. Pleading on Information and Belief

Under the PSLRA, plaintiffs pleading on information and belief must now "state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1)(B). The parties disagree as to whether the plaintiffs must meet the heightened standard for pleading on information and belief or whether they are given a pass on this requirement because they aver the consolidated amended complaint (CAC) is based on "the investigation of counsel."[2] In their brief, plaintiffs in-

---

**2.** The complaint states that "Plaintiffs, by their attorneys, for their consolidated amended class action complaint, allege upon personal information as to themselves and their own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation made by and through counsel,

which investigation included, *inter alia*, a review of the public filings by defendant PETs-MART, Inc. . . . with the Securities and Exchange Commission ("SEC"), articles in the financial news media, press releases, publicly available information concerning the Company, and consultations with experts and per-

sist that "[t]hough the Complaint states that it is based upon information and belief, it is clear that plaintiffs' allegations are based upon 'counsel's investigation.'" (plf. memo in opp. at 9). Thus, they conclude, plaintiffs are not subject to the heightened pleading standard established by § 78u–4(b)(1)(B).

Several courts have held that when pleadings are based on counsel's investigation of SEC filings, securities analyst's reports, and information obtained from former employees, they are not pleading "based on information and belief" and are therefore not subject to final provision of § 78u–4(b)(1)(B). *See Zeid v. Kimberley,* 973 F.Supp. 910, 915 (N.D.Cal.1997); *Warman v. Overland Data, Inc.,* 1998 WL 110018, *3 (S.D.Cal.). Other courts have held that a general statement regarding "investigation of counsel" is insufficient to avoid PSLRA requirements. *See, e.g., Novak v. Kasaks,* 997 F.Supp. 425, 431 (S.D.N.Y.1998) (holding that single paragraph asserting that plaintiffs based their information and belief on investigation of SEC filings, analysts' reports, press releases, and discussions with consultants neither provided required facts underlying complaint's allegations, nor directed court to where facts could be found). These holdings are not necessarily inconsistent, however, and the plaintiffs here have it backwards. As the court in *Zeid* explained, insisting that the complaint is not based on information and belief but rather on the investigation of counsel is the same as pleading personal knowledge. *Zeid,* 973 F.Supp. at 915. This does not reduce plaintiff's burden to plead with particularity, it heightens it. *Id.* The option to plead on information and belief is an acknowledgment by Congress that many of these issues will be particularly within the defendant's knowledge. By opting out of "pleading by information and belief," plaintiffs must now do more than merely plead the facts from which they *infer* falsity and intent to defraud. Plaintiffs must now plead with *greater particularity* (1) each

statement alleged to have been misleading, (2) the reason or reasons why the statement is misleading, and (3) as to each statement, those facts giving rise to a strong inference that Defendants acted with scienter. *Id.*

### b. Pleading Scienter

Rule 9(b) relaxes the particularity requirement for pleading the scienter element of a fraud claim, providing that "Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.Proc. 9(b). Federal courts applying this rule to securities fraud pleadings, however, created a patchwork of standards. *See Rehm,* 954 F.Supp. at 1251 (citing examples). Hoping to create a national pleading standard and to deter wasteful "fishing expeditions," Congress codified the Second Circuit's "strong inference" standard in the Reform Act. A complaint alleging securities fraud must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). If a complaint fails to do so, dismissal is required. 15 U.S.C. § 78u–4(b)(3)(A).

■ The Supreme Court has directed that the "requisite state of mind" for private securities fraud actions implied under § 10(b) is a mental state embracing an "intent to deceive, manipulate, or defraud." *Hochfelder* 425 U.S. at 193–194 n. 12, 96 S.Ct. 1375 (1976). Mere negligence will not suffice. *See In re Baesa Securities Litigation,* 969 F.Supp. 238, 240–241 (S.D.N.Y.1997). Although the Supreme Court left open the question as to whether recklessness is sufficient, the Ninth Circuit has confirmed that it is. In *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1569–70 (9th Cir.1990), *cert. denied,* 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991), the court embraced the Seventh Circuit's standard of recklessness as de-

sons knowledgeable of the matters alleged        herein." (CAC p. 1).

fined in *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1044–45 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977), and reiterated the following explanation:

> Reckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Hollinger,* 914 F.2d at 1569, *quoting Sundstrand Corp.,* 553 F.2d at 1045 (other citations omitted); *see also In re Software Toolworks, Inc.,* 50 F.3d 615, 626 (9th Cir. 1994). Thus, under the Reform Act, a complaint will not be dismissed for failure to plead scienter if it states with particularity specific facts giving rise to a "strong inference" that the defendants made a highly unreasonable omission, one that represents an extreme departure from the standards of ordinary care. 15 U.S.C. § 78u–4(b)(3)(A).

■ That much is certain. We note, however, that courts within this circuit and across the country still disagree as to what Congress intended to require when it codified the Second Circuit's "strong inference" standard in the PSLRA. *See* Michael B. Dunn, *Pleading Scienter after the Private Securities Litigation Reform Act: Or, a Textualist Revenge,* 84 Cornell L.R. 193 (1998). Prior to the Reform Act, plaintiffs in the Second Circuit could plead scienter either with facts constituting "strong circumstantial evidence of conscious misbehavior or recklessness" or with facts showing that "defendants had both motive and opportunity to commit fraud." *See Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994). The legislative history of the PSLRA provides conflicting instructions as to whether Congress intended to retain the both "motive and opportunity" and "recklessness" standards notwithstanding the absence of that language in the statute, and courts have followed divergent paths. *See In re*

*Silicon Graphics, Inc. Sec. Litig.,* 970 F.Supp. 746 (N.D.Cal.1997) (concluding PSLRA eliminated both tests and requires plaintiffs to allege—for each misstatement—specific facts that constitute circumstantial evidence of conscious behavior); *Marksman,* 927 F.Supp. at 1310–1311 (concluding that two-prong test survives); *Zeid,* 973 F.Supp. at 916 (requiring "substantial factual basis" for strong inference of scienter and modifying two-prong test for forward looking statements); *Schlagel v. Learning Tree Int'l,* CV 98–0020, slip opinion at 31 (C.D.Cal. Dec. 23, 1998) (concluding that legislative history of the Securities Litigation Uniform Standards Act of 1998 confirms that Congress did not intend the PSLRA to alter scienter requirements); *Rehm v. Eagle Fin. Corp.,* 954 F.Supp. 1246, 1253 (N.D.Ill.1997) (holding that both tests survive but pre-Reform Act case law is not binding); *In re Baesa,* 969 F.Supp. at 242 (concluding that even in the Second Circuit, pleading motive and opportunity is not automatically sufficient to raise "strong inference" under the PSLRA).

We need not rehash the confused legislative history here. We simply conclude that in the absence of Ninth Circuit precedent clarifying the circuit's approach, we will follow *Marksman* and *Rehm,* and use the Second Circuit's two-prong test to determine if there is a "strong inference" of scienter, keeping in mind that while Congress was serious about pleading with particularity, it did not intend to eliminate civil enforcement of our securities laws.

A word about our approach, then. We will first consider each group of alleged misstatements or omissions to determine whether each has been pleaded with sufficient particularity and, as to each substantive allegation, whether plaintiff has adequately pleaded recklessness. If the allegations do not create a strong inference of reckless conduct, the court will consider whether the CAC has adequately alleged defendants' motive and opportunity to defraud the market.

## II.  Substantive Allegations

The Consolidated Amended Complaint (CAC) is cumbersome and unhelpful in its presentation.  It merely recites the same allegations for every advance press release and subsequent SEC filing during the class period, with little differentiation.  We remind plaintiffs that the heightened pleading rules are designed to elicit clarity, not volume.  The court should not have to play connect-the-dots in order to identify the facts and trends upon which plaintiffs base their claim.[3]  After some work, however, we have boiled the 71–page complaint down to four principal allegations.  First, defendants waited too long before warning investors of competing flea and tick treatments.  Second, defendants failed to disclose their intention to decrease PETsMART's participation in the catalog business.  Third, defendants failed to disclose PETsMART's intentions regarding leased spaced to veterinary clinics and its relationship with MMI.  And fourth, defendants misstated their financial results in every press release and SEC filing during the class period because (a) flea and tick product inventory was written-down too late, (b) no reserve was ever established to cover catalog sales taxes owed to Arizona, California, and Texas, and (c) recurring write-downs of inventory and other assets were mischaracterized as non-recurring restructuring charges and merger costs.

### a.  Flea and Tick Inventory

■ According to the complaint, defendants knew before the class period that

---

**3.**  We are not the first to experience frustration with an unwieldy, superficial complaint alleging securities fraud.  We find it worthwhile to reiterate the catalog of abuses compiled by the court in *Wenger v. Lumisys, Inc.,* 2 F.Supp.2d 1231, 1244 (N.D.Cal.1998), in the hope that plaintiffs' counsel will give considered thought to efficient pleading and meaningful analysis.

> In the context of securities class action complaints, courts have repeatedly lamented plaintiffs' counsels' tendency to place "the burden [ ] on the reader to sort out the statements and match them with the corresponding adverse facts to solve the 'puzzle' of interpreting Plaintiffs' claims."  *In re Oak Technology Sec. Litig.,* 1997 WL 448168, *5 (N.D.Cal. Aug. 1, 1997); *see also GlenFed,* 42 F.3d at 1554 (These "puzzle-style" complaints are an "unwelcome and wholly unnecessary strain on defendants and the court system.");  *May v. Borick,* 1997 WL 314166, *8 (C.D.Cal. Mar.3, 1997) ("[The complaint's] organization obfuscates rather than clarifies.  Plaintiff's failure to address defendants' allegedly misleading statements individually, or even by category, and to state why each statement, or category of statements is misleading, renders this Court's task, and the task of the defendants, excessively difficult.");  *Strassman v. Fresh Choice,* 1995 WL 743728, *4 (N.D.Cal. Dec.7, 1995) ("The FAC's deficiencies do not stem simply from its length, but rather from its requirement that the reader find the needle in the haystack.");  *Chan v. Orthologic Corp.,* Civ. No. 96–1514, slip at 28 n. 11 (D.Ariz. Feb. 5, 1998) (By dumping long lists of "specific" reasons

into the complaint, the plaintiff "make[s] a mockery of Rule 9(b) and the Reform Act.");  *Williams v. WMX Technologies, Inc.,* 112 F.3d 175, 178 (5th Cir.) ("A complaint can be long-winded, even prolix, without pleading with particularity.  Indeed, such a garrulous style is not an uncommon mask for an absence of detail.  The amended complaint here, although long, states little with particularity.");  *Zeid,* 973 F.Supp. at 918 ("This method of pleading imposes an unnecessary burden on Defendants and the Court to sort out the alleged misrepresentations and match them with the corresponding 'adverse facts.' ");  *In re Conner Peripherals, Inc.,* 1996 WL 193811, *1 (N.D.Cal. 1996) ("The complaint as written requires the court to excavate for actionable claims. . . . Judicial resources are too scarce and worthy cases too pressing for a court to spend its time rooting around in bloated complaints drafted by experienced lawyers for a handful of actionable allegations.");  *Shuster v. Symmetricom, Inc.,* 1997 WL 820967, *1 (N.D.Cal. June 25, 1997) ("The Complaint as it now stands is a rambling set of allegations which is almost impossible to effectively review. . . . Plaintiff sets forth lengthy quotes from various releases by defendants' officers and a securities analyst but does not make clear what portion of each quote constitutes a false representation.");  *Kane v. Madge Networks, N.V.,* 96–20652 RMW (N.D.Cal.1997) ("This maze-like style renders it almost impossible to determine the sufficiency of plaintiffs' explanations as to why the alleged statements were false or misleading when they were made.").

new drug therapies would make PETs-MART's inventory of flea and tick products obsolete. Plaintiffs allege that in order to artificially inflate the price of PETsMART stock, defendants intentionally or recklessly failed to warn investors of the impending change in consumer preferences, failed to write-down the obsolete inventory as would have been appropriate under generally accepted accounting principles (GAAP), and released misleading financial statements both to the media and the SEC. We find that these allegations are unaccompanied by sufficient particularized facts to create a strong inference of recklessness.

It is undisputed that in November of 1994, the FDA approved Ciba–Geigy's Program treatment and by the spring of 1995 it was being prescribed by veterinarians. (CAC ¶ 66; def. memo at 10). Plaintiffs infer that defendants knew about Program before May 20, 1996, because PETsMART leased space in its stores to veterinarians (CAC ¶ 69; plf. memo in opp. at 12), but the complaint fails to include any facts regarding specific veterinarians, prescriptions, transactions, communications or individual PETsMART employees to support this conclusion. Plaintiffs do not include a single fact which suggests when any of the four individual defendants became aware of the new treatments or of their potential popularity with consumers. Alternatively, if defendants are to be charged with this knowledge simply because the information was available to the public, then plaintiffs, as participants in an efficient market, should have been aware of these competing treatments when they purchased shares during the class period. *See In re Convergent Tech. Sec. Litig.,* 948 F.2d 507, 513 (9th Cir.1991) ("As a general matter,

investors know of the risk of obsolescence posed by older products forced to compete with more advanced rivals.").

The timing of PETsMART's disclosures and write-downs also fails to raise the specter of reckless omissions. The complaint makes clear that Advantage, the topical version of the flea and tick treatment, did not hit the market until November of 1996. Within six months thereafter, PETsMART's annual 10K for FY1996 specifically reported that the new therapies might "negatively impact[ ]" the sales of certain flea and tick products. (CAC at 92). Plaintiffs say this was too little, too late. It was too little, they argue, because the statement was merely a "benign reference" to the new therapies, insufficient to adequately warn investors.[4] (CAC ¶ 92). It was too late, they suggest, because subsequent SEC filings addressed the competitive potential of the new therapies more thoroughly. However, "Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 53 (2d Cir.1995) (defendants' lack of clairvoyance simply does not constitute securities fraud), *citing Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978) (holding that defendant's failure to anticipate future events did not constitute securities fraud); *DiLeo v. Ernst & Young,* 901 F.2d 624, 627–28 (7th Cir.1990) ("There is no fraud by hindsight."). As to whether it was too little, the June 1997 interim SEC filing included three separate statements in the MDA clarifying that shifting consumer preferences due to "the introduction of new alternative treatments" would continue to have a negative impact into the future.[5] (CAC ¶ 105; def. docs., D at 9). The cautionary language in the MDA is all the

---

**4.** We note that market analysts were already aware of PETsMART's sluggish flea and tick sales. In September of 1996, one professional analyst rated PETsMART as an outperform "despite continued weakness in the Flea and Tick category," though he attributed the products' downturn to unfavorable weather conditions. (def. docs., Ex. A, at 1).

**5.** Plaintiffs acknowledge only one of the three warnings in their complaint. But a court ruling on a motion to dismiss may consider the full texts of documents which the complaint quotes only in part. *Fecht v. The Price Co.,* 70 F.3d 1078, 1080 n. 1 (9th Cir.1995).

more note-worthy because few other product lines are discussed in the SEC filings, thereby putting any reasonable investor on notice that the flea and tick products should be watched more carefully.

The CAC also charges that the write-down of obsolete inventory came too late, rendering every prior financial statement during the class period a misstatement of fact because it overstated gross profits. But again, the CAC fails to include any particularized facts indicating that the timing of the write-down was unusual or reckless. It is insufficient to allege in conclusory fashion that PETsMART had "accumulated a significant quantity of excess, obsolete, or otherwise ·unsalable inventory" during every quarter of the class period. (CAC ¶ 141). The pleading must provide some particularized support regarding inventory levels, the defendants' knowledge, and approximately when plaintiffs think the write-down should have occurred. Even if we assume defendants knew in the spring of 1995 that the new therapies would compete with their high margin products, there is no information to support the allegation that the inventory "was obsolete" and "could not be sold at any price" by May of 1996 or any one of the specific filing periods thereafter. (plf. memo in opp. at 19) In fact, the only

support in the complaint is that some flea and tick inventory was allegedly written down during the second quarter ending August 3, 1997,[6] but, as the Seventh Circuit observed in *DiLeo*, "No matter when a bank [writes down a loan], someone may say that it should have acted sooner." 901 F.2d at 627. On the other hand, a company taking a charge the moment a competitor's product appears to be doing well would be equally suspect for jumping the gun.

Furthermore, because the complaint fails to include the price of PETsMART's stock during and after the relevant events alleged in the pleadings, we can draw no inference about the value of this information to investors. Unlike the situation in *Rehm*, 954 F.Supp. at 1250, for example, there is no suggestion that market analysts lowered the company's rating immediately after the write-down was "revealed" to the investment community in September 1997. *See also Marksman*, 927 F.Supp. at 1303 (observing that stock lost 62% of its value after *Barron's* financial journal published an article questioning company's accounting practices). Plaintiffs merely note again and again that the stock price "languished at around $9.50 per share in July 1998" as compared to its highest trade at $29⅝ on some unspecified date during the class period. (plf. memo in opp. at 3, 25, 26, CAC ¶ 8).[7]

---

**6.** PETsMART announced its financial results for the second quarter on August 25, 1997. (CAC ¶ 111). The CAC quotes PETsMART as reporting a $61 million charge in operations, of which "approximately $9.4 million of related charges were recorded as costs of goods sold." *Id.* Defendants charge that this account and a concurrent explanation by defendant Parker were material misstatements because they failed to specify that a portion of the $9.4 million included the write-down of obsolete flea and tick inventory. (CAC ¶ 113). Plaintiffs point to additional disclosures on the September 17, 1997 Form 10–Q which states that a portion of the $9.4 million included "the writedown of certain non-Discovery Center inventory from cost to net realizable value as a result of the decision to exit other product categories." The statement goes on to predict that "The Company expects that all such discontinued inventory will be sold by the end of fiscal 1997." Plaintiffs infer that this discontinued inventory was the

over-the-counter flea and tick products, but fail to plead a single fact to support their conclusion.

**7.** There are other scattered references to the price of PETsMART's stock in the complaint. Paragraph 48 notes that it closed at $23 per share on December 18, 1996, the day PETsMART acquired all outstanding equity securities of Pet City Holdings. Paragraph 163 quotes an article from the *Richmond Times Dispatch* as saying that shares "dropped from their October [1996] highs in the $30s to hover at the $20 level" in March 1997. Paragraph 96 reports that the stock price dropped $4⅞16 per share to $12.125 on May 2, 1997, when DLG downgraded PETsMART to a "buy" from "recommended." The downgrade occurred four days after the FY96 10–K was filed and three weeks after identical financial results were reported in the company's press release. (CAC ¶ 89). Paragraph 100 reports that the stock dipped to $10¹³⁄16 on

Lastly, plaintiffs appear to have a materiality problem here. A false statement or omission will be considered "material" under § 10(b) only if there is a substantial likelihood that a reasonable shareholder would consider it important to the investment decision. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231–232, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). The Court has instructed that the materiality floor should no be set so low that management is led "to bury the shareholders in an avalanche of trivial information." *Id.* at 231, 108 S.Ct. 978, *quoting TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 448–449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). The CAC alleges that flea and tick products were within the category of "high margin products" which "traditionally accounted for at least 10–15% of the Company's total sales." (CAC at ¶ 16). Plaintiffs provide no supporting facts or citation for this claim. At paragraph 141a, plaintiffs propose a more conservative estimate when they suggest that over-the-counter flea and tick remedies "accounted for up to 10% of group revenues." Under this estimate the alleged 18% reduction in flea and tick sales resulted at most in a 1.8 % decline in group revenues. Although materiality is generally a question for the jury, *Fecht v. Price Co.*, 70 F.3d 1078, 1080–81 (9th Cir.1995), under Ninth Circuit precedent, revenue shortfalls of 10% or less may be immaterial as a matter of law. *See Convergent Tech.*, 948 F.2d at 514; *Silicon Graphics*, 970 F.Supp. at 766.

Although plaintiffs need not prove their claim in the pleadings, they have failed to plead facts which give rise to a strong inference of a highly unreasonable omission of material information regarding over-the-counter flea and tick products.

### b. Catalog Operations and Sales Tax Obligations

■ Plaintiffs allege that PETsMART intentionally concealed its decision to exit the catalog business from investors. There is nothing in the pleading, however, to indicate that PETsMART directors actually planned such an exit, or that they have exited the catalog market. The complaint does include a statement from the company's May 27, 1998 announcement of first quarter financial results to the effect that " PETsMART's financial performance reflects [a] planned reduction in catalog circulation versus last year," (CAC ¶ 131b), but there is no support for plaintiffs' contention that this statement was inaccurate or incomplete. It is true that the statement departs—at least in tone—from earlier announcements that catalog sales were responsible in part for improved margins in 1996 (CAC ¶¶ 82, 90), from statements promoting PETsMART as the "leading direct retailer of pet related and equine products in North America" (CAC ¶ 127), and from press statements highlighting "improvements in the company's catalog division." (CAC ¶ 124) But "improvements" are not inconsistent with circulation reduction. Indeed, if earlier mailings had been poorly targeted, then a strategic reduction in catalog circulation could well lead to improved margins. Furthermore, a company "need not detail every corporate event, current or prospective." *Convergent Tech.*, 948 F.2d at 516 (9th Cir. 1991) (rejecting allegation that defendants had failed to disclose the progress of efforts to implement a new mechanization structure). Without more facts to support an inference of an intentional misstatement, as plaintiffs allege (CAC 124–128; plf. memo in opp. at 7), the May 27, 1998 statement regarding catalog operations cannot support a claim of securities fraud.

---

May 8, 1997 but closed up on May 9, and again on May 12, when it closed at $12 ⅟₁₆. The only other price references can be found in plaintiffs' reports of stock sales by company "insiders." (CAC ¶¶ 72–75, 79, 162). The memorandum in opposition fails to shed any light on the timing of large drops in price or significant sales by defendants, presumably freeing the court to impose a suspect chronology. We decline the invitation.

Plaintiffs also allege that defendants knew or recklessly disregarded information suggesting that PETsMART's catalog operations were not in compliance with the applicable state sales and use tax laws. According to the complaint, "When an out-of-state seller makes shipments to an instate purchaser, the seller is responsible by law to collect the state use tax if the out-of-state seller has some physical connection (*i.e.* 'nexus') with the state of the purchaser." (CAC ¶ 52, plf. memo in opp. at 5). PETsMART has such a nexus with Arizona, Texas, California and other unspecified states, according to the complaint, because the company distributes catalogs and accepts product returns at retail stores it operates in those jurisdictions. (CAC ¶¶ 54–59). Thus, plaintiffs conclude, PETsMART's failure to collect state taxes—other than for its New York customers—exposed the company to substantial fines and penalties.

Here, the complaint does provide facts illuminating PETsMART's entry into the catalog business (CAC ¶¶ 53–61) and identifies by name two defendants who were allegedly informed that the company was violating state laws. The CAC alleges that "Robert Sperandio, the former president of Sporting Dog, advised defendants Hansen and Dorsey, among other PETsMART managers and employees, that the Company was violating state tax laws because of the failure to collect and remit state sales and use taxes." (CAC ¶ 60a). Plaintiffs also claim that Dorsey was notified of this fact by former (unnamed) officers and employees of State Line Tack. No details are provided regarding the timing, format, or specific content of any communication,

however. Nor do plaintiffs identify a single specific sale subject to such taxes, any public records indicating that such taxes are due, or any evidence that state authorities have attempted to collect back taxes, fines, or penalties. *Compare Rehm*, 954 F.Supp. at 1255 (party's significant restatement of earnings at the behest of independent accountants provided evidence of fraud); *with Chan v. Orthologic Corp.*, Civ. No. 96–1514, slip at 32–33, 1998 WL 1018624 (D.Ariz. Feb. 5, 1998) (unsupported claims that defendants engaged in illegal marketing practices rejected as too conclusory). In the absence of specific credible facts demonstrating the company's noncompliance with specific state laws, the catalog tax allegations do not meet the pleading standards for securities fraud. Again, plaintiffs have failed to provide the who, what, when, where, and how necessary to get over even the initial 9(b) hurdle.[8]

### c. PETsMART's Veterinary Business and MMI

Plaintiffs contend that "[t]hroughout the Class Period" the PETsMART defendants failed to disclose "the adverse impact" of the company's decision to lease space within its stores to veterinary clinics (CAC ¶ 143b) and its plans to expand PETsMART clinics (CAC ¶ 143c) in violation of APB Opinion No. 28 which " 'encourage[s] management to provide commentary [in published annual reports] relating to the effects of significant events upon interim financial results' " (CAC ¶ 142). Plaintiffs further allege that PETsMART's omission of information regarding "the true nature

---

8. Defendants argue, in the alternative, that the catalog claims must be dismissed for a failure to plead loss causation. They argue that because the catalog tax liability was never disclosed to the market, any drop in stock prices cannot be attributed to the alleged misrepresentation. For support, they point to *Knapp v. Ernst & Whinney*, 90 F.3d 1431, 1438 (9th Cir.1996), *cert. denied*, 519 U.S. 1112, 117 S.Ct. 952, 136 L.Ed.2d 839 (1997). The case is inapposite. *Knapp* holds that in a fraud-on-the-market case, plaintiffs establish loss causation if they show that the price on the date of purchase was inflated because of the misrepresentation. *Id.; see also Wool v. Tandem Computers*, 818 F.2d 1433, 1437 (9th Cir.1987) (focus should be on "the difference between the purchase price and the value of the stock at the date of purchase"). *Knapp* explicitly rejected Ernst & Whinney's argument that plaintiffs who both purchased and sold their stock before corrective statements were issued could not have established loss causation. *Knapp* at 1438.

of the company's ownership interest in MMI" violated the principles articulated in Statement of Financial Accounting Standards No. 57 (FASB No. 57). Plaintiffs argue that under Regulation S–X, financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed misleading and inaccurate, therefore the failure to illuminate the details of this aspect of PETsMART's operations is actionable securities fraud. (CAC ¶¶ 146, 147; plf. memo in opp. at 16–17). We note that plaintiffs have all but abandoned the claims regarding MMI—FASB No. 57 appears nowhere in their brief—but we decide a motion to dismiss based on the pleadings and if a claim is adequately pleaded, it will survive.

▆▆▆▆ As a matter of law, the price of PETsMART's stock cannot be overinflated based on an omission if the market was otherwise aware of the information. *In re Apple Computer Securities Litigation*, 886 F.2d 1109, 1115 (9th Cir.1989) ("[I]n a fraud on the market case, the defendant's failure to disclose material information may be excused where that information has been made credibly available to the market by other sources."), *cert. denied*, 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990); *Convergent Tech.*, 948 F.2d at 513. Plaintiffs' own complaint cites to a published report by industry analysts, dated October 30, 1996, which thoroughly discusses PETsMART's veterinary business, clinics, lease arrangements, and relationship with MMI. (CAC ¶ 144; Def. RJN at Q, *3–7). The complaint also cites to defendants' annual 10–K for the fiscal year ended February 2, 1997, which specifically notes under "Risk Factors" that

> In certain locations, PETsMART leases space to veterinary clinics, including both clinics operated by a subsidiary of PETsMART and independently-operated clinics, and the Company intends to lease space to clinics in other superstores as appropriate.

(Def. docs. at C, at 9). Ordinarily, the "truth on the market" defense involves a fact-intensive inquiry to determine wheth-

er the information from third-party sources was sufficient to cure the effect of the original misstatement or omission. *In re Apple*, 886 F.2d at 1116. But here, it is not even clear that plaintiffs have pleaded an omission. Beyond their conclusory allegations, plaintiffs provide no specifics as to the "adverse impacts" omitted from defendants' public statements beyond a vague reference in paragraph 93 to lost sales, nor do they indicate which transactions between MMI and PETsMART were "material related party transactions" which should have been disclosed pursuant to generally accepted accounting principles. These claims do not even approach the level of particularization required under the PSLRA. *See Zeid*, 973 F.Supp. at 922 (plaintiffs "must identify particular transactions underlying the defendants' alleged accounting deficiencies"). There is no who, what, when, where, or how to satisfy Rule 9(b) and no single fact is alleged regarding defendants' state of mind. "To adequately allege scienter, in addition to bare allegations of GAAP violations, the complaint must show that defendants recklessly disregarded the deviance or acted with gross indifference towards the purported material misrepresentations contained in the financial statements." *Rehm*, 954 F.Supp. at 1255, *citing In re In–Store Advertising Securities Lit.*, 878 F.Supp. 645, 649 (S.D.N.Y.1995). All claims regarding PETsMART's veterinary business and clinics and its relationship with MMI must be dismissed.

**d. Remaining Claims of Accounting Fraud and Optimistic Statements**

▆▆▆ As discussed above, none of plaintiffs' allegations regarding catalog or veterinary operations or flea and tick inventory meet the particularized pleading requirements of Rule 9(b) or the PSLRA. These same claims fare no better when cast as violations of Item 303 of Regulation S–K of the Exchange Act. In the Ninth Circuit, violations of Item 303 or Exchange Rules are insufficient, standing alone, to support a claim under § 10(b).

*See In re VeriFone Sec. Litig.*, 11 F.3d 865, 870 (9th Cir.1993) (rejecting argument that violation of exchange rules governing disclosure may be imported as a surrogate for straight materiality analysis under Section 10(b) and Rule 10b–5); *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293 (9th Cir.1998) (distinguishing Section 11 from Section 10(b) of the Exchange Act and holding that an Item 303 violation is sufficient for liability under Section 11).

The remaining statements alleged to be false or misleading are inactionable forward-looking statements. 15 U.S.C. § 78u–5(c)(1)(A). Generic forecasts such as "We believe our prospects for continued growth in 1997 are exciting" (CAC ¶ 85d) and "We remain optimistic about our long-term revenue and earnings growth prospects as the Company continues to grow its business in both North America and the United Kingdom" (CAC ¶ 101c) simply do not alter the total mix of information available and important to investors. *See Fisher v. Acuson Corp.*, 1995 WL 261439, at *3 (N.D.Cal.).

### III. Motive and Opportunity

■ Because we find that plaintiffs have not adequately pleaded any of the above claims with the particularity required under Rule 9(b) or § 78u–4(b), we need not reach defendants' "motive and opportunity" for securities fraud. However, because many of the problems noted above could theoretically be cured with an amended complaint, we will examine whether the CAC has adequately pleaded the defendants' motive and opportunity for securities fraud. To satisfy the scienter requirement by this method, plaintiffs must plead facts demonstrating both a motive and an opportunity to commit fraud. *Zeid,* 973 F.Supp. at 923. "Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Shields v. Citytrust Bancorp Inc.*, 25 F.3d 1124, 1130 (2d Cir.1994). "Opportunity would entail the means and likely prospect

of achieving concrete benefits by the means alleged." *Id.*

■ As for opportunity, the CAC avers that each defendant "is, or was, a senior executive officer and, accordingly, controlled the information disseminated to the investing public in PETsMART's press releases, SEC filings, and communications with analysts." (CAC ¶ 157). "Thus, each could falsify, and did falsify, the information that reached the public about PETsMART's business, products, and financial results." *Id.* This conclusory statement is insufficient under 15 U.S.C. § 78u–4(b)(2) which requires scienter to be plead "with respect to each act or omission alleged to violate this chapter." The complaint must address all four defendants individually and identify who is to be held accountable for each specific misstatement or omission. Plaintiffs rely instead on the Ninth Circuit's "group publishing" doctrine (plf. memo in opp. at 33) which creates a presumption that statements in "prospectuses, registration statements, annual reports, press releases, or other 'group published information,'" are the collective work of those individuals with direct involvement in the day-to-day affairs of the company. *In re GlenFed, Inc.*, 60 F.3d 591 (9th Cir.1995); *Powers v. Eichen*, 977 F.Supp. 1031, 1040 (S.D.Cal.1997). Although we do not dispute plaintiffs contention that the doctrine survives the PSLRA, it may not be used as a pass card for conclusory pleadings. For example, although the complaint provides a rough employment history of each of the four defendants (CAC ¶¶ 25–28), it leaves the task of identifying windows of opportunity to the court. We interpret the complaint to suggest that Parker and Dorsey had the opportunity to commit fraud during the entire class period (CAC ¶¶ 25, 27); Hansen had the opportunity to commit fraud only until June 13, 1997, when he resigned (CAC ¶ 26); and Schnabel had the opportunity to commit fraud during the period between February and November 1997 (CAC ¶ 28). Ignoring these windows alto-

998

gether, plaintiffs do little to differentiate among the individual defendants' responsibility for public statements or accounting errors. Instead, plaintiffs attempt to avoid the requirement to plead with particularity by alleging a "scheme" to defraud in which the individual defendants "had the opportunity to... participate..." (CAC ¶¶ 155–157, plf. memo in opp. at 3, 33). This leaves too many pleading questions unanswered. Do plaintiffs mean to suggest, for example, that Hansen had the opportunity and was motivated to inflate the price of stock for a convertible note offering which occurred five months after his departure? Or that Schnabel should be held responsible for optimistic statements made during 1996 even though she didn't arrive until February of 1997? Plaintiffs' memo of law suggests that one "deceptive act in furtherance of the scheme" or one incident of insider trading is enough to make each defendant liable for every alleged omission or misstatement during the class period. (plf. memo in opp. at 33–34). Plaintiffs' two principal authorities for this proposition do little to help their case. In *S.E.C. v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1471 (2d Cir. 1996), the court affirmed the principal's liability as a primary violator based on the district court's finding that the executive officer "was aware of and 'was intimately involved in' the [illegal pricing] decisions..., and that he orchestrated First Jersey's balkanization of its branches in order to keep customers in the dark." *Id.* at 1472. Under his direction, the firm hired individuals with no prior experience in the securities business, distributed sales scripts describing the "recommended security" as a "spectacular turnaround situation," and discouraged independent research before selling a security. First Jersey's sale and repurchase scheme resulted in $27 million dollars in illegal profits. Here, plaintiffs have not alleged a single fact regarding a coordinated scheme to commit accounting fraud or to deceive investors as to PETsMART's financial status, nor have they differentiated among defendants' alleged roles in the scheme.

Plaintiffs also cite to *Cooper v. Pickett*, 137 F.3d 616 (9th Cir.1997), and there is language in that opinion which provides more support for plaintiffs' position. There the court indicated that § 10(b) liability may arise from "allegations that a group of defendants acted together to violate the securities laws, as long as each defendant committed a manipulative or deceptive act in furtherance of the scheme." *Id.*, at 624. A footnote in the opinion makes clear, however, that the court was applying pre-PSLRA standards because the case was commenced before December 22, 1995. *Id.*, at 628 n. 2. The holding in *Cooper*, thus, cannot be reconciled with Congress' later instruction in § 78u–4(b)(2) that scienter be pleaded with particularity as to each "defendant." *See Castillo v. Dean Witter Discover & Co.*, 1998 WL 342050, *12 (S.D.N.Y.). Thus, contrary to plaintiffs' assertions, they cannot combine the group pleading doctrine with an allegation of a fraudulent scheme to avoid pleading critical details.

■ As for motive, plaintiffs allege that the four defendants made the materially false and misleading statements in order to artificially inflate the price of PETsMART's stock. The CAC identifies five distinct benefits which would accrue to defendants if they were successful: an inflated price (i) would facilitate PETsMART's acquisition of third parties using the company's stock as currency (CAC ¶¶ 156, 159–161), (ii) would bolster corporate efforts to raise capital by issuing convertible notes to the investing public (CAC ¶¶ 156, 165–166); (iii) would allow insiders to personally profit from the sale of PETsMART's common stock at artificially inflated prices (CAC ¶¶ 156, 162–164); (iv) would show lenders strong financial results at a time when PETsMART was amending the company's credit facility. (CAC ¶¶ 156, 164), and (v) would enhance defendants' opportunities for bonuses and long-term benefits linked to the company's financial performance (CAC ¶¶ 156, 158).

The bonus and benefits allegations are clearly insufficient to establish motive. The Second Circuit rejected a similar argument in *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 53–54 (2d Cir.1995) and its reasoning has been adopted by the district courts of this circuit. *See Marksman,* 927 F.Supp. at 1312. Otherwise, "virtually every company in the United States that experiences a downturn in stock price" would be forced to defend against actions for securities fraud. *Acito,* 47 F.3d at 54. The argument that defendants needed to show lenders strong financial results is similarly unpersuasive. Reputational enhancement will always help to advance corporate goals. A desire to present a sound financial profile cannot be viewed, alone, as circumstantial evidence giving rise to a strong inference of scienter. Again, there are no facts in the entire amended complaint which lead to a strong inference that the company's financial statements were not accurate when made.

The first two alleged motivations are about raising capital. *Glickman* held that the "generic motive" of increasing capital is not enough. *Glickman v. Alexander & Alexander Services, Inc.,* 1996 WL 88570, *6, *11 (S.D.N.Y.1996); *In re Gupta Corp.,* 900 F.Supp. at 1231; *Chan,* Civ. No. 96–1514, slip at 26 (plaintiffs must plead facts beyond corporation's desire to raise capital); *In re Health Management, Inc. Securities Litigation,* 970 F.Supp. 192, 204 (E.D.N.Y.1997) (pleading insufficient where "plaintiffs do not expressly or even inferentially explain how the desire to conclude various acquisitions by using inflated value of the stock as consideration for mergers and to obtain financing for such acquisitions[ ] is in the informed economic self-interest of the Individual Defendants"). Thus, the mere allegation that

PETsMART executives were hoping to "acquire third parties using the Company's stock as currency" (CAC ¶ 156) is wholly insufficient. The purchase of Pet City is the only specific acquisition identified in this context,[9] but nothing about the transaction is alleged to be unusual. No detail about the transaction is provided which gives rise to a strong inference that the defendants improperly structured the transaction or released information at suspicious intervals. In fact, plaintiffs' memo in opposition to the motion dismiss includes one sentence about the transaction as proof of motive: "Maintaining an artificially high stock price facilitated approval from the acquired companies' shareholders with regard to each transaction and lowered PETsMART's financing costs." (plf. memo in opp. at 24). Similarly, the complaint merely reviews the generic concerns of acquiree shareholders when stock is offered as consideration. (CAC ¶ 161). The same is true of the allegations regarding the convertible note in November of 1997: "Defendants knew that the higher the price of PETsMART common stock the lower the financing costs to PETsMART." (CAC ¶ 166).[10] *Glickman,* 1996 WL 88570, at *11, and *In re Health Securities,* 970 F.Supp. at 204, rejected similar conclusory allegations.

The heart of plaintiffs' attempt to plead scienter is the record of stock sales amassed by PETsMART insiders during the class period. Allegations that a corporate insider either presented materially false information, or delayed disclosing materially adverse information, in order to sell personally-held stock at a huge profit can supply the requisite "motive" for a scienter allegation. *Marksman,* 927 F.Supp. at 1312. Thus, insider trading

9. According to plaintiffs, the transaction was accounted for as a pooling of interests and closed on December 18, 1996. To pay for the Pet City acquisition, PETsMART issued 7,844,000 shares of its common stock, and reserved another 304,000 shares for issuance upon the exercise of Pet City stock options assumed in the merger. (CAC ¶ 48).

10. We note further that the convertible note offering occurred on November 4, 1997, months after the alleged write-down of flea and tick inventory was disclosed to the market. Plaintiffs cannot argue, therefore, that defendants delayed release of the flea and tick information for the purpose of bolstering its acquisition of Pet City.

activity during the class period may support a strong inference of scienter. *Id.*, citing *Acito*, 47 F.3d at 54; *In re Apple Computer*, 886 F.2d at 1117. But, courts have repeatedly held that the mere existence of stock sales does not raise a strong inference of fraudulent intent. *See Lumisys*, 2 F.Supp.2d at 1251. Plaintiffs have the burden at the pleading stage of explaining why the stock sales were unusual or suspicious. *See In re Health Mgmt. Sys. Inc., Sec. Litig.*, 1998 WL 283286, *3 (S.D.N.Y. June 1, 1998). This requires a showing that the trading was "in amounts dramatically out of line with prior trading practices, at times calculated to maximize personal benefit from undisclosed inside information." *Alfus v. Pyramid Technology Corp.*, 764 F.Supp. 598, 605 & n. 1 (N.D.Cal.1991), citing *In re Apple Computer*, 886 F.2d at 1117. Where a corporate insider sells only a small fraction of his or her shares in the corporation, the inference of scienter is weakened. *Acito*, 47 F.3d at 54 (finding sale of 11% of holdings insufficient). Twenty percent of a corporate insider's shares, especially where the dollar amounts involved are high, however, may constitute a "suspicious amount" sufficient to support a scienter allegation. *See Alfus*, 764 F.Supp. at 605. Other courts have held that where an individual retained more shares than he or she sold, the resulting aggregate loss will defeat an inference of fraud. *Chan*, Civ. No. 96–1514, slip at 24.

As a preliminary matter, we find that defendant Susan Schnabel did not sell any shares of stock during the class period and there can be no argument therefore that she was motivated to defraud PETsMART investors by a desire to maximize personal economic benefit. As to the other three defendants, we find that the amended complaint fails to show that defendants' sales were sufficiently unusual or suspicious to support a strong inference of scienter. Again the complaint's dearth of particularized facts diminishes its force. It fails to allege whether defendants' sales were a departure from past trading practices, for example, and does not even provide the percentage of shares sold during the class period. We have done a rough calculation of these percentages based on the information provided in the complaint, and find them legally unremarkable.

According to the CAC, defendant Mark Hansen owned 805,881 shares on April 1, 1997. During the class period, he sold a total of 135,000 shares in seven transactions over ten months, realizing gross profits of $3.4 million. If we assume he bought and sold no other shares during the class period, the sales would represent less than fifteen percent of his holdings. As *Chan* explains, where an individual retains significantly more shares than he or she sold, the resulting aggregate loss may defeat an inference of fraud. Without more facts to suggest that these sales were "suspicious," we find they do not raise a strong inference of scienter.

We are told that defendant C. Donald Dorsey owned 687,175 shares of common stock on May 1, 1998. (CAC ¶ 27). According to the CAC, he executed five transactions during the class period, selling a total of 125,662 shares and realizing gross profits of $4.1 million dollars. If we assume he bought and sold no other shares during the class period, the sales would represent approximately 15% of Dorsey's holdings, again an amount which would not appear suspicious given the volume of PETsMART shares he retained.

At first glance, Chairman Samuel Parker's sales come closer to raising an inference of a personal profit motive. According to the complaint, Parker owned 1,125,087 shares of common stock as of May 1, 1998. In the first month of the class period, he sold 391,646 shares realizing gross profits of $17.4 million dollars. If we assume he bought and sold no other shares during the class period, the sales would represent more than 25% of Parker's holdings, an amount sufficient to raise eyebrows under *Alfus'* standard. However, because the transactions occurred on May 28 and 29, 1996, they would only be probative of Parker's mo-

tives regarding events prior to those sales. The only alleged misstatement prior to those sales is the press release issued May 20, 1996 regarding first quarter financial results. This, of course, was prior to the release of Advantage and prior to any alleged decision to curtail catalog sales. Thus, the only conceivable allegation for which Parker's sales would constitute evidence of scienter, would be a failure to mention the new drug therapies and, as discussed above, plaintiffs did not plead sufficient particular facts to suggest that this was an unreasonable omission.

Lastly, we reject plaintiffs efforts to bolster the perception of "insider trading" by pleading the stock sales of unnamed defendants during the class period. Without specific facts suggesting that defendants intended their manipulation of PETs-MART's stock to assist these specific colleagues, we find no reason to consider these transactions. *See Chan*, slip at 24 n. 9 (allegations that non-speaking defendants sold stock held insufficient to establish motive).

## IV. Count II

In count II, plaintiffs allege that the individual defendants violated Section 20(a) of the Exchange Act. To state a claim under section 20(a), however, plaintiffs must plead a violation of 10(b). Our dismissal of count I for failure to plead a primary violation of the Securities Exchange Act requires the dismissal of count II. *See Lumisys*, 2 F.Supp.2d at 1252.

## CONCLUSION

There is undoubtedly less investor optimism about PETsMART's prospects now than there was in May 1996 when the company was in the midst of rapid growth. The court takes judicial notice of the fact that the price of PETsMART's stock dropped precipitously during 1997 after a steady climb the year before. But investors must point to some facts suggesting that this financial deterioration was attributable to fraud, *DiLeo*, 901 F.2d at 627, or that the price of the stock was impermissibly manipulated to defraud investors. The complaint simply contains none of the typical indicia of securities fraud. There has been no dramatic restatement of financial results. There has been no investigation by the media or any government agency regarding PETsMART's operations, accounting practices, tax liability, marketing materials, or prospectuses. There is no sign of a coordinated "scheme."

We conclude that plaintiffs' complaint is merely a series of conclusory allegations insufficient to support a single claim of securities fraud. The Consolidated Amended Complaint is dismissed in its entirety. We dismiss without prejudice and with leave to amend within 60 days. We, however, caution plaintiffs against refiling unless they can cure the significant deficiencies discussed above. This would require plaintiffs to commit to a theory of who knew what when, who did what when, and why. While this may foreclose certain litigating strategies, it is necessary to meet the pleading burdens imposed by Congress to deter fishing expeditions by disappointed investors.