**In re COPPER MOUNTAIN SE-
CURITIES LITIGATION.**

No. C–00–3894–VRW.

United States District Court,
N.D. California.

March 30, 2004.

Francis M. Gregorek, Francis A. Bottini, Jr., Betsy C. Manifold, Wolf Haldenstein Adler Freeman, Symphony Towers, Jeffrey R. Krinsk, Gregory Hartlett, Finkelstein & Associates, James A. Caputo, Spector Roseman & Kodroff, P.C., Blair A. Nicholas, Robert S. Gans, Alan Shulman, Bernstein Litowitz Berger & Grossmann LLP, William S. Lerach, Milberg Weiss Bershad Hynes & Lerach LLP, William E. Grauer, Cooley Godward LLP, San Diego, CA, Lawrence G. Soicher, Law Offices of Lawrence G. Soicher, Jeffrey A. Klafter, Bernstein Litowitz Berger & Grossmann, Pamela Kulsrud, Ira M. Press, Kirby McInerney & Squire LLP, Frederic S.

Fox, Christine M. Fox, Kaplan Kilsheimer & Fox LLP, Andrew D. Friedman, Samuel K. Rosen, Wechsler Harwood Halebian & Feffer, LLP, Stanley Grossman, Marc I. Gross, Paul T. Curley, Pomerantz Haudek Block Grossman & Gross LLP, James Bashian, James V. Bashian Law Offices, David Jaroslawicz, Jaroslawicz & Jaros, Mel E. Lifshitz, Bernstein Liebhard & Lifshitz, Marvin L. Frank, Rabin & Garland, Kenneth A. Elan, Law Office of Kenneth A. Elan, Lee S. Shalov, Ralph M. Stone, James P. Bonner, Shalov Stone & Bonner, Joseph H. Weiss, Mark A. Smilow, Weiss & Yourman, Nadeem Faruqi, Faruqi & Faruqi LLP, Jeffrey S. Abraham, Law Offices of Jeffrey S. Abraham, Harold B. Obstfeld, Harold B. Obstfeld Law Office, Robert C. Susser, Wallace A. Showman, Law Offices of Wallace A. Showman, Peter D. Bull, Joshua M. Lifshitz, Bull & Lifshitz, Eduard Korsinsky, Daniel A. Osborn, Beatie & Osborn, LLP, Lee Squitieri, Squitieri & Fearon, LLP, Joseph Garland, Law Office of Joseph Garland, Saul Roffe, Sirota & Sirota, Stephen J. Fearon, Jr., Suitieri & Fearon, LLP, Stephen D. Oestreich, Slotnick Shapiro & Crocker LLP, New York, NY, Nina F. Locker, Ignacio E. Salceda, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA, James M. Finberg, Lieff Cabraser Heimann & Bernstein LLP, Jan Nielsen Little, Keker & Van Nest LLP, Joseph J. Tabacco, Jr., Christopher T. Heffelfinger, Jennifer S. Abrams, Berman DeValerio Pease Tabacco Burt & Pucillo, Patrick J. Coughlin, Randi D. Bandman, Lesley E. Weaver, Milberg Weiss Bershad Hynes & Lerach LLP, Steven O. Sidener, Joseph M. Barton, Gold Bennett Cera & Sidener LLP, John W. Allured, Law Offices of John W. Allured, Laurence D. King, Hugh K. Campbell, Kaplan Fox & Kilsheimer LLP, Daniel C. Girard, Girard & Green, San Francisco, CA, Arnold Levin, Levin Fishbein Sedran & Berman, Stuart H. Savett, Barbara A.

Podell, Savett, Furtkin, Podell & Ryan P.C., Sherrie R. Savett, Arthur Stock, Berger & Montague, P.C., Michael D. Donovan, Donovan Searles LLC, Mark S. Goldman, Kellie A. Allen, Weinstein Kitchenoff Scarlato & Goldman, Ltd., James M. Orman, Law Offices of James M. Orman, Brian M. Felgoise, Law Offices of Brian M. Felgoise, Anthony J. Bolognese, Bolognese & Associates, Jeffrey L. Kodroff, Spector & Roseman, P.C., Douglas M. Risen, Berger & Montague P.C., Philadelphia, PA, Jeffrey C. Block, Michael G. Lange, Chancey D. Steele, Berman Devalerio Pease Tabacco Burt & Pucillo, Boston, MA, Juli Farris, Lynn Lincoln Sarko, Elizabeth Ann Leland, Keller Rohrback, Karl P. Barth, Steve W. Berman, Anthony D. Shapiro, Hagens & Berman LLP, Steven J. Toll, Cohen Milstein Hausfeld & Toll PLLC, Seattle, WA, Lionel Z. Glancy, Michael Goldberg, Glancy & Binkow LLP, Brian Barry, Kevin J. Yourman, Leigh A. Parker, Weiss & Yourman, Michael D. Braun, Stull Stull & Brody, Los Angeles, CA, Marc A. Topaz, Schiffrin & Barroway LLP, Marc S. Henzel, Law Offices of Marc S. Henzel, Evan Smith, Brodsky & Smith, LLC, Bala Cynwyd, PA, Alfred G. Yates, Jr., Law Office of Alfred G. Yates Jr., Pittsburgh, PA, Leo W. Desmond, The Law Offices of Leo W. Desmond, Michael J. Pucillo, Berman DeValerio Pease Tobacco Burt & Pucillo, West Palm Beach, FL, Dennis J. Johnson, Jacob B. Perkinson, Law Offices of Dennis J. Johnson, South Burlington, VT, Andrew M. Schatz, Jeffrey S. Nobel, Schatz & Nobel, Hartford, CT, Bruce G. Murphy, Law Offices of Bruce G. Murphy, Vero Beach, FL, Charles J. Piven, Law Offices of Charles J. Piven, Baltimore, MD, David R. Scott, Scott & Scott, LLC, Colchester, CT, Alan R. Plutzik, Bramson Plutzik Mahler & Birkhaeuser LLP, Walnut Creek, CA, Jill M. Manning, Kirby McInerney & Squire, LLP, Novato, CA, William M. Audet, Alexander Hawes & Audet, San Jose, CA, Steven E. Cauley, Cauley & Geller LLP, Little Rock, AR, Marc H. Edelson, Hoffman & Edelson, Doylestown, PA, William B. Federman, Dreier Baritz & Federman, Oklahoma City, OK, Patrick V. Dahlstrom, Pomerantz Haudek Block Grossman & Gross, Chicago, IL, Paul J. Geller, Sr., Cauley & Geller, Boca Raton, FL, Richard S. Wayne, Thomas P. Glass, Strauss & Troy, Hugh K. Campbell, Law Offices of Hugh K. Campbell, Cincinnati, OH, Seth D. Rigrodsky, Morris & Morris, Wilmington, DE, Jody Anderman, LeBlanc Maples & Waddell, Baton Rouge, LA, Mark McNair, Law Office of Mark McNair, Donald J. Enright, Finkelstein Thompson & Loughran, Washington, DC, Corey D. Holzer, Holzer & Holzer, Atlanta, GA, for Plaintiffs.

William E. Grauer, Philip C. Tencer, Cooley Godward LLP, San Diego, CA, James E. Miller, Scott & Scott, LLC, Colchester, CT, for Defendants.

### ORDER

WALKER, District Judge.

It is well-known that the Private Securities Litigation Reform Act (PSLRA) and FRCP 9(b) impose a particularity requirement in the allegation of securities fraud. This is especially important in the case of a complaint alleging open market fraud or fraud on the market, such as the complaint at bar.

The starting point for the particularity analysis is not the allegedly *false* or *misleading* statements of the defendants, but the *truth* that emerges from the market. An open market trades on different points of view of an issuer's prospects. If *all* investors thought the same things, there would be no trading except that prompted by the need of investors to re-balance their portfolios among investment alternatives (i e, cash versus bonds, stocks versus cash, etc). What matters in an open market

case is the total mix of information in the market and whether that mix has been altered in some significant way to create a very widely, indeed essentially universal, but wrong view of the value of the security at issue. It is the "truth" that reveals the "error" of the market. The disclosure of this "truth" avulsively changes the price of the security. But disclosure of a market "error" does not make out a case of "fraud on the market." Starting with the "truth," the complaint must allege facts to show that the previously settled but false investor expectations can be laid at the feet of defendants. This may seem simple, although it is not easy to do. A complaint satisfying the particularity requirement does not require rococo factual detail, but it does require specifics. So a plaintiff seeking to allege open market securities fraud does well to begin the analysis with the "truth," stack it up against what preceded it and then see if acts, omissions or statements of defendants can plausibly be said to be responsible for the "truth" not emerging earlier when plaintiffs traded their securities.

Generally, open market fraud complaints fail to satisfy the required pleading standard in one of several different ways. Most often plaintiffs cannot identify a false statement of defendant that might account for causing a security issue's price to be distorted. Even if a statement that turns out to be false can be identified, it is usually so laden with cautionary language as to be unactionable as a practical matter. In the more common omissions case, plaintiff may be unable to find a ground upon which to allege that defendant knew the omitted fact or had a duty to disclose it. This complaint illustrates these various shortcomings.

Defendants Copper Mountain Networks, Inc (CM), Richard Gilbert (Gilbert) and John Creelman (Creelman) move to dismiss plaintiff Quinn Barton's (Barton) consolidated class action complaint in this securities class action litigation. Doc. # 85. The court finds that: (1) the allegations in Barton's complaint are not pled with the requisite degree of particularity; (2) the allegations in Barton's complaint are insufficient to support a strong inference of scienter; and (3) many of the statements upon which Barton premises liability are immunized under the PSLRA's safe harbor provision for forward-looking statements. Accordingly, the court GRANTS defendants' motion to dismiss the complaint.

I

The court discussed the procedural history of this case in great detail in its previous order dated February 10, 2004 (Doc. # 131), and need not repeat that history here. The following facts come from plaintiffs' consolidated complaint (CC; Doc. # 80). Plaintiff Barton is a CM stockholder who purchased 1000 shares of CM stock at $68 per share on August 18, 2000. CC at 3 ¶ 6, Attach A. Defendant CM is a supplier of high-speed Digital Supplier Line (DSL) products. CC at 4 ¶ 12. Defendant Gilbert is president and CEO of CM and has held such position since April 1998. Id. at 4 ¶ 9. Defendant Creelman was CM's CFO during the class period, though he resigned this position in March 2001. Id. at 4 ¶ 10. Barton brings suit against the defendants on the basis of allegedly false statements made during the class period from April 19, 2000, to October 17, 2000. See Id. at 4 ¶ 8. During the class period, CM had approximately 51 million shares of stock outstanding, which traded at a price as high as $125 per share. Id. at 4 ¶ 8, 20–21 ¶ 106. After the class period, the stock's value fell to less than $10 per share. Id. at 20 ¶ 105.

At oral argument, Barton contended that the nubbin of his allegations against

defendants regarding false or misleading statements is that, on several occasions during the class period, defendants had announced impressive revenue and earnings per share projections. But on October 17, 2000, defendants announced that CM's revenues and earnings would fall far short of those projections. See CC at 20 ¶ 103. Barton maintains that those revenue and earnings projections during the class period were false when made. Barton also contends that a number of other statements by defendants regarding CM's business prospects were misleading. Barton provides eight reasons why defendants' statements were false or misleading:

1. CM's relationship with Lucent was declining (CC at 12 ¶ 76, 14 ¶ 85 and 21 ¶ 107);

2. Lucent was planning to introduce a competing product -the Stinger—that would have a negative impact on CM's sales and revenue (*Id.* at 14 ¶ 85, 15 ¶ 90);

3. NorthPoint had announced an intention to purchase DSL from Cisco (*Id.* at 13 ¶ 80, 15 ¶ 90);

4. CM's CLEC customers were not established (*Id.* at 17 ¶ 96);

5. CM was shipping goods to fewer customers (*Id.* at 13 ¶ 80, 15 ¶ 85 and 21 ¶ 107);

6. CM's CLEC customers were losing market capitalization and informed CM that they would be scaling back orders (*Id.* at 12 ¶¶ 72, 76, 13 ¶ 80, 86 ¶ 85, 15 ¶ 90, 19 ¶ 101, 21 ¶ 107);

7 Sales of DSLAM were declining (*Id.* at 13 ¶ 80, 21 ¶ 107);

8. CM's profit margins were declining (*Id.* at 21–22 ¶ 107).

Defendants argue that Barton's CC fails to satisfy the heightened pleading standards required in a securities fraud action, based on three alleged defects: (1) Barton has failed to plead fraud with particularity (Mot. Dism. (Doc. # 85) at 3:1–5); (2) Barton fails to set forth a factual basis giving rise to a strong inference of scienter as to any allegedly false statement (*id.* at 3:6–10); (3) many of the allegedly false statements at issue were forward-looking projections or information providing the underlying bases for such projections and were accompanied by safe harbor warnings or protected by the "bespeaks caution" doctrine (*id.* at 3:11–13).

## II

As a preliminary matter, the court must consider whether to take judicial notice of certain documents attached either to defendants' request for judicial notice (RJN; Doc. # 82), the declarations of William E Grauer (Grauer Decls. I and II; Docs. ## 83, 96) and the declaration of Tony Ramos (Ramos Decl.; Doc. # 84). Defendants contend that all the documents so attached are the proper subject of judicial notice pursuant to FRE 201.

Exhibits H through K to the RJN are Form 3s and 4s filed with the SEC regarding the stock sales of Gilbert and Creelman, while Exhibits A through G and L to the RJN are other SEC filings. Defendants contend that the court is authorized to take judicial notice of documents filed with the SEC. The court agrees that judicial notice of such documents is proper. See, e.g., *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1276 (11th Cir.1999); *Allison v. Brooktree Corp.,* 999 F.Supp. 1342, 1352 n. 3 (S.D.Cal 1998). This conclusion is bolstered by the fact that courts are specifically authorized, in connection with a motion to dismiss a securities fraud complaint, to consider documents and filings described in the complaint under the incorporation by reference doctrine. See, e.g., *Ronconi v. Larkin,* 253 F.3d 423, 427 (9th Cir.2001); *In re Silicon Graphics Sec. Litig.,* 183 F.3d 970, 986 (9th Cir.1999).

Thus, the court takes notice of all the documents attached to the RJN.

■ Exhibits C through K to the Ramos Declaration are CM press releases. Such press releases contain "safe harbor" warnings regarding any forward-looking statements in the press releases. Judicial notice of these exhibits is proper for several reasons. First, the court is required to consider "any cautionary statement accompanying [a] forward-looking statement, which [is] not subject to material dispute, cited by the defendant." 15 USC § 78u–5(e). Second, the court may take judicial notice of information that was publicly available to reasonable investors at the time the defendant made the allegedly false statements. See *In re First Union Corp Sec. Litig.*, 128 F.Supp.2d 871, 883 (W.D.N.C.2001). Third, such press releases are proper to consider under the incorporation by reference doctrine. *Silicon Graphics*, 183 F.3d at 986. Exhibits A and B to the Ramos Declaration are transcripts of CM conference calls. Because the transcripts contain safe harbor warnings and because Barton relies on the conference calls in the CC, the transcripts are the proper subject of judicial notice as well. See § 78u–5(e); *Silicon Graphics*, 183 F.3d at 986. Accordingly, the court takes judicial notice of all the exhibits attached to the Ramos Declaration.

■ Exhibits G to the Grauer Declaration I is a printout of CM's stock price for the duration of the class period. Information about the stock price of publicly traded companies the proper subject of judicial notice. *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 166 n. 8 (2d Cir.2000). Exhibit A to the Grauer Declaration I is a copy of the cover page in the first-filed securities fraud suit filed against CM. As it is a record in the court's own file, it is the proper subject of judicial notice. Exhibits E, F, and I to the Grauer Declaration I are a Lucent press release dated September

ber 7, 1999, a Kaufman Bros' analyst report dated October 9, 2000, and an article published in Motleyfool.com dated October 12, 2000. All three documents are relied upon by Barton in his CC and are thus the proper subject of judicial notice. *Silicon Graphics*, 183 F.3d at 986. The court accordingly takes judicial notice of all the requested documents attached to the Grauer Declaration I.

Exhibit C to the Grauer Declaration II is a Form 8–K filed by Rhythm with the SEC on August 15, 2001. Judicial notice of this document is proper for the same reasons judicial notice of the other SEC filings is proper. Exhibit E to the Grauer Declaration II is a press release from Cisco Systems dated May 8, 2000. Judicial notice of such a press release, as previously noted, is proper. Accordingly, the court takes judicial notice of Exhibits C and E to the Grauer Declaration II.

Exhibit D to the Grauer Declaration II is a copy of a Form 4 filed with the SEC by CM. This same form is filed with the RJN as Exhibit I, and Barton disputes the accuracy of RJN Exhibit I in his opposition to defendants' motion, noting that the number of pages was possibly inaccurate. See Opp. Mot. Dism. (Doc. # 91) at 14:2 n. 1. Grauer attests that he obtained a second copy of this form based on Barton's concern and that the document contains the same number of pages as the original Exhibit I. See Grauer Decl. II at 2 ¶ 5. Because Grauer has obtained the same form twice, the court accepts that the page number is correct; thus, judicial notice of Exhibit D is proper for the same reasons as it is proper for the other SEC filings.

### III

#### A

The court first considers the proper standard by which to judge the adequacy

of a complaint in a securities fraud action brought pursuant to Section 10(b) and Rule 10b–5.

1

FRCP 12(b)(6) motions to dismiss essentially "test whether a cognizable claim has been pleaded in the complaint." *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir.1988). FRCP 8(a), which states that plaintiff's pleadings must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," provides the standard for judging whether such a cognizable claim exists. *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir.2001). This standard is a liberal one that does not require plaintiff to set forth all the factual details of his claim; rather, all that the standard requires is that plaintiff give defendant fair notice of the claim and the grounds for making that claim. *Leatherman v. Tarrant County Narcotics Intell. & Coord. Unit*, 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (citing *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). To this end, plaintiff's complaint should set forth "either direct or inferential allegations with respect to all the material elements of the claim". *Wittstock v. Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir.2003).

Under Rule 12(b)(6), a complaint "should not be dismissed for failure to state a claim unless it appears beyond doubt that plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Hughes v. Rowe*, 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (citing *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)); see also *Conley*, 355 U.S. at 45–46, 78 S.Ct. 99. All material allegations in the complaint must be taken as true and construed in the light most favorable to plaintiff. See *Silicon Graphics*, 183 F.3d at 980 n. 10. But "the court [is not] required to

accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.2001) (citing *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754–55 (9th Cir.1994)).

Review of a FRCP 12(b)(6) motion to dismiss is generally limited to the contents of the complaint, and the court may not consider other documents outside the pleadings. *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir.2001). The court may, however, consider documents attached to the complaint. *Parks School of Business, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir.1995). If a plaintiff fails to attach to the complaint the documents on which the complaint is based, a defendant may attach such documents to its motion to dismiss for the purpose of showing that the documents do not support plaintiff's claim. *In re Autodesk, Inc. Sec. Litig.*, 132 F.Supp.2d 833, 837 (N.D.Cal.2000) (citing *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir.1994)). This permits the court to consider the full text of a document that the plaintiff's complaint only partially quotes. *Autodesk*, 132 F Supp 2d at 838 (citing *In re Stac Electronics Sec. Litig.*, 89 F.3d 1399, 1405 n. 4 (9th Cir.1996), cert. denied, 520 U.S. 1103, 117 S.Ct. 1105, 137 L.Ed.2d 308 (1997)). Additionally, "[t]he court need not * * * accept as true allegations that contradict matters properly subject to judicial notice * * *." *Sprewell*, 266 F.3d at 988 (citing *Mullis v. United States Bankruptcy Court*, 828 F.2d 1385, 1388 (9th Cir.1987)).

2

In a securities fraud action, a heightened standard of pleading applies. First, a case brought under Section 10(b) and Rule 10b–5 must meet the particularity requirements of FRCP 9(b). *Stac Electronics*, 89 F.3d at 1404; see also *In re*

*GlenFed. Inc. Sec. Litig.,* 42 F.3d 1541, 1545 (9th Cir.1994) (en banc). Rule 9(b) requires a plaintiff alleging fraud to "set forth what is false or misleading about [the] statement[ ] and why it is false." *GlenFed,* 42 F.3d at 1548.

Second, plaintiff's complaint must satisfy the requirements of the PSLRA. As defendants maintain, Congress in 1995 endeavored to address the problems posed by private securities litigation and attempted to limit the so-called "abuse and misuse" of such litigation so that financial and productivity losses would be minimized. See S Rep No 98, 104th Cong., 1st Sess. at 5–9 (1995) (Grauer Decl. I, Exh. B). The result of Congress' reform efforts was the PSLRA, which imposes several stringent requirements on securities fraud pleadings. The complaint must: (1) "specify each statement alleged to have been misleading [ and] the reason or reasons why the statement is misleading * * * " (15 USC § 78u–4(b)(1)); (2) with respect to any such allegations based upon information and belief, "state with particularity all facts on which that belief is formed" (15 USC § 78u–4(b)(1)); and (3) "with respect to each act or omission * * * state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" (15 USC § 78u–4(b)(2)).

■ Even if plaintiff meets the three requirements, the PSLRA carves out a safe harbor from liability if the statements at issue were forward-looking and accompanied by meaningful risk warnings. 15 USC § 78u–5(c); see also *Splash I,* 2000 U.S. Dist. LEXIS 15369 at *16. An analogous doctrine (which predates the enactment of the PSLRA) is the "bespeaks caution" doctrine, which allows a court to rule as a matter of law that defendant's forward-looking statements contained enough cautionary language or risk disclosure to protect against liability. See, e.g., *Pro-*

*venz v. Miller,* 102 F.3d 1478, 1493 (9th Cir.1996). If a defendant's statements are immunized under either doctrine, dismissal of the complaint is appropriate. See *id; In re Splash Technology Holdings, Inc Sec Litig,* 2000 U.S. Dist. LEXIS 15369, *29 (N.D.Cal.) (*Splash I* ).

### B

The court now turns to whether Barton's CC meets these stringent requirements.

#### 1

Defendants' first argument is that Barton has failed to satisfy the pleading with particularity requirement of Rule 9(b) and the PSLRA. As defendants note, requiring plaintiff to plead all details relating to his allegations of fraud "is the PSLRA's single most important weapon against pleading fraud by hindsight because it forces plaintiff[ ] to reveal whether [he] base[ ][his] allegations on an inference of earlier knowledge drawn from later disclosures or from contemporaneous documents or other facts." *In re The Vantive Corp. Sec. Litig.,* 110 F Supp 2d 1209, 1216 (N.D.Cal.2000).

■ Under the PSLRA, a complaint must specifically allege: (1) each specific false statement; (2) the reasons on which plaintiff bases his belief that the statements were false when made; (3) all facts on which that belief is formed; and (4) specific facts that give rise to a strong inference that defendant acted with scienter, i e, that defendant acted intentionally or with deliberate recklessness. *Ronconi,* 253 F.3d at 429; § 78u–4(b)(1) & (2). Barton contends that he has satisfied these pleadings requirements because, for each statement, he has specified who made the statement, to whom the statement was made, the dates such statements were made and the reasons such statements were false. Opp. Mot. Dism. at 10:15–11:2

(citing *In re Verity, Inc Sec Litig*, 2000 WL 1175580, *2–3, 2000 U.S. Dist. LEXIS 11720, *7–8 (N.D.Cal.2000)). Defendants contend that this is not enough.

i

■ First, defendants contend that the facts alleged are insufficient to show that defendants' statements were false. As noted above, Barton essentially offers eight reasons why CM's projections regarding its future revenue and potential for revenue growth were false:

1. CM's relationship with Lucent was declining (CC at 12 ¶ 76, 14 ¶ 85 and 21 ¶ 107);

2. Lucent was planning to introduce a competing product -the Stinger— that would have a negative impact on CM's sales and revenue (*Id.* at 14 ¶ 85, 15 ¶ 90);

3. NorthPoint had announced an intention to purchase DSL from Cisco (*Id.* at 13 ¶ 80, 15 ¶ 90);

4. CM's CLEC customers were not established (*Id.* at 17 ¶ 96);

5. CM was shipping goods to fewer customers (*Id.* at 13 ¶ 80, 15 ¶ 85 and 21 ¶ 107);

6. CM's CLEC customers were losing market capitalization and informed CM that they would be scaling back orders (*Id.* at 12 ¶¶ 72, 76, 13 ¶ 80, 86 ¶ 85, 15 ¶ 90, 19 ¶ 101, 21 ¶ 107);

7. Sales of DSLAM were declining (*Id.* at 13 ¶ 80, 21 ¶ 107);

8. CM's profit margins were declining (*Id.* at 21–22 ¶ 107).

Defendants contend that the CC does not allege why these facts mask defendants' false, as opposed to merely wrong— that is, incorrect—projections of future events. Defendants contend that Barton does not identify: (1) when any particular customer informed CM that it would begin scaling back; (2) how much any particular customer reduced its orders from CM; (3) the dates when such reductions were announced or actually took place; (4) the amount of business represented by such notifications; (5) when CM began shipping to fewer customers; (6) the identities of the customers to whom CM no longer shipped or to whom CM reduced shipments; or (7) when CM's revenues and margins began to decline. Mot. Dism. at 9:1–9. Defendants also allege that Barton's complaint lacks an explanation regarding why, if true, such facts would have made CM's revenue and growth projections false—in other words, Barton fails to allege any facts explaining why CM could not have achieved such revenue and growth in spite of reduced orders. *Id.* at 9:10–13.

The court agrees. In *Silicon Graphics*, the Ninth Circuit suggested that, to plead with sufficient particularity, it is not enough merely to assert the existence of information—rather, the crucial details of the information itself is required. " 'Particularity' refers to 'the quality or state of being particular,' i e, 'dealing with or giving details; detailed; minute; circumstantial' * * * Thus, we read the statutory command that the plaintiff plead all the 'facts' with 'particularity' to mean that a plaintiff must provide a list of all relevant circumstances in great detail." 183 F.3d at 984, quoting *Random House College Dictionary* 473 (rev. ed. 1980). While Barton's allegations indicate that CM's business may have hit some sizeable bumps in the road, the allegations contain little to show that defendants knew of these bumps but did not disclose them. The court finds it difficult to infer that defendants' statements were false when made simply because the projections in those statements did not come completely true. For example, without sufficient detail regarding the amount of reductions in customer orders, it is not possible to know the scope of the

impact of such reductions on CM's business and thus whether the projected revenues and earnings would be impossible to meet. And without knowing the precise timing of such reductions, it is impossible to discern whether defendants were aware of the alleged problems at the times they made their revenue and earnings projections.

Defendants also allege that many of the allegedly false statements on which Barton premises liability are vague and indefinite opinions that constitute mere "puffery." "[P]redictions and forecasts which are not of the type subject to objective verification are rarely actionable under § 10(b) and Rule 10b–5. * * * An inability to foresee the future does not constitute fraud, because the securities law approach matters from an ex ante perspective." *Searls v. Glasser,* 64 F.3d 1061, 1066 (7th Cir.1995). Some courts in this district have found that vague statements are not actionable because "they are considered immaterial and discounted by the market" and because "reasonable investors do not consider 'soft' statements or loose predictions important in making investment decisions." See, e.g., *Wenger v. Lumisys,* 2 F Supp 2d 1231, 1245 (N.D.Cal.1998). In *Wenger,* the court cited several examples of such vague, inactionable statements, including: (1) "We're the leader in a rapidly growing market"; (2) "We have the convergence of the health care trends* * * * [defendant] is positioned at the crest of those two converging trends"; (3) "We have an extremely broad product line"; and (4) "1995 was a very good year for [defendant]* * * * [defendant] introduced five new products * * * [and] the acquisition of [another company] expanded our product line to include video capture digitizers and data compression boards * * * *". *Id.* at 1245–46; see also *In re Gupta Corp. Sec. Litig.,* 900 F.Supp. 1217, 1236 (N.D.Cal.1994) (finding that statements such as "business couldn't be bet-

ter," "it's a great time for a company like ours," and "we already have a sizable lead over our competition" were not actionable).

Defendants argue that many of the allegedly false statements fall in this category, and Barton does not dispute this assertion. Such statements include:

- In the April 18, 2000, press release, Gilbert is quoted as saying, "[W]e feel that [CM] has a strong product set to pursue emerging MTU opportunities." CC at 11 ¶ 68; Ramos Decl., Exh. C.
- On May 29, 2000, Gilbert reassured investors and analysts that CM's business remained "strong." CC at 13 ¶ 78.
- CM's April 28, 2000, Form S–1/A states that "[CM] designs, manufacture, sells and supports [DSL] products and believes the demand for high speed access solutions which are enabled by such products is significant and will continue to grow with the use of the Internet, the proliferation of data intensive applications and the proliferation of and corporate networking applications." CC at 12 ¶ 78; RJN, Exh. E at 27.
- CM's July 17, 2000, press release predicted that "[w]e expect that these products will continue to position [CM] solutions as best-of-breed for the evolving business, MTU, and residential DSL market." CC at 14 ¶ 82; Ramos Decl., Exh. D.
- In the October 12, 2000, Motleyfool.com interview, Gilbert asserted that consolidation in the DSL market would be "very positive for [CM] * * *." CC at 19 ¶ 100; Grauer Decl. I, Exh. I.
- On September 27, 2000, Creelman stated that CM sold a significant amount of equipment to "established" CLEC customers. CC at 16 ¶ 94.

The court agrees that these statements are vague and constitute run-of-the-mill corporate optimism on which no reasonable investor would rely. See *Wenger*, 2 F.Supp.2d at 1246.

ii

Defendants also argue that Barton's complaint fails to satisfy the particularity requirements because it is does not contain sufficient facts regarding the sources of Barton's information. Defendants contend that, to satisfy the requirement that the bases of Barton's information and belief be pled with particularity, Barton must rely on more than unidentified documents and unspecified sources and must plead the existence of inconsistent contemporaneous information. Mot. Dism. at 6:14–21.

In *Silicon Graphics*, the Ninth Circuit made clear that securities fraud allegations cannot rest upon unidentified sources and unspecified documents. In reviewing the adequacy of the complaint in that case, the court of appeals noted that plaintiff relied in part on the existence of internal reports that contradicted defendant's public representations. The appellate court reasoned that one of the complaint's deficiencies was that "it lack[ed] sufficient detail and foundation necessary to meet either the particularity or strong inference requirements of the PSLRA. * * * [Plaintiff] fails to state facts relating to the internal reports, including their contents, who prepared them, which officers reviewed them and from whom [plaintiff] obtained the information." *Id.* at 984. Thus, the court of appeals concluded that "[i]n the absence of such specifics, we cannot ascertain whether there is any basis for the allegations that the officer had actual or constructive knowledge of [defendant's] problems that would cause their optimistic representations to the contrary to be consciously misleading." *Id.* at 985.

The Ninth Circuit emphasized a similar point in *Yourish v. California Amplifier*, 191 F.3d 983 (9th Cir.1999). In that case, the appellate court considered plaintiff's generalized allegation regarding the existence of confidential non-public information available to defendants but provided no details about the information, other than the "true facts" revealed by the information. *Id.* at 994. The allegations contained "none of the particulars" about the information, such as what medium contained the information, when the information was made available to the people inside the company, which of the defendants would have had access to the information or when such defendants would have been aware of such information. *Id.* In reaching its conclusion that plaintiff's allegations were insufficient, the appellate court cited the Seventh Circuit's decision in *Arazie v. Mullane*, 2 F.3d 1456 (7th Cir.1993). The Seventh Circuit concluded that an assertion that defendant company's " 'internal documents admitted' " various facts was insufficient under Rule 9(b) because the complaint did not " 'indicate who prepared the projected figures, when they were prepared, how firm the numbers were, or which * * * officers reviewed them.' " *Yourish*, 191 F.3d at 995–96, quoting *Arazie*, 2 F.3d at 1467.

This strict standard has been followed even by courts of this circuit that have found the standard to be somewhat taxing to plaintiffs. " '[A] proper complaint which purports to rely on the existence of internal reports would contain at least some specifics from those reports as well as such facts as may indicate their reliability' * * * [A]lthough requiring a plaintiff to provide specifics from the reports prior to discovery seems a bit unfair, we are bound by our prior caselaw (sic) and give the internal reports little or no weight in our analysis." *No 84 Employer–Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d

920, 942 n. 20 (9th Cir.2003), quoting *Silicon Graphics,* 183 F.3d at 985.

Applying these standards to the case at bar, the court finds that Barton's complaint is deficient. As defendants note, Barton begins by stating that his information and belief is "based upon the investigation made by and through his attorneys, which investigation included, among other things, a review of the public documents, press releases, news reports, and analyst reports of [CM]." CC at 2:12–16. The *Silicon Graphics* court found such boilerplate pleading to be inadequate to support claims of fraud. 183 F.3d at 985. Similarly, the *Yourish* court noted that boilerplate language was insufficient and led the court to the conclusion that the "drafters of the complaint often seemed to have done little more than copy verbatim language from [the defendant's] public filings, and then proclaim at more or less regular intervals that the statements were false." 191 F.3d at 995 (internal citations omitted).

In addition to this boilerplate assertion, Barton's complaint includes several other potential bases for his information and belief. First, Barton asserts that Gilbert and Creelman were aware of certain negative information because Gilbert and Creelman "received, on a regular basis, reports from [CM's] finance department setting forth sales and operations of [CM], summarizing orders, dollar volumes of the orders, and product type sold." CC at 9–10 ¶ 61. Such allegation fails to include many critical details, including when such reports were written, who wrote the reports and when the alleged reports were received and read. Barton thus fails to provide any corroborating details that would indicate the reliability of such reports. Second, Barton alleges that defendants "spoke on a regular basis with Lucent and [CM's] other customers and knew about their customers' plans to drastically reduce their purchases from CM" and "knew, based on

regular communications with Lucent, that [CM's] relationship with Lucent was deteriorating at a rate which was far more rapid than the defendants knowledge [sic]." *Id.* at 10 ¶¶ 62, 64. Such allegations fail to identify many of the particulars of such communications, such as when the communications were made, which customers (aside from Lucent) were involved, with which employees at those companies communications were made and what positions in those companies such employees held. Barton's complaint thus provides no indication of the reliability of these statements.

Barton's final allegation supporting his information and belief is that, because Gilbert and Creelman were top executives at CM, they must have known the relevant information regarding the DSL business, CM's business and sales cycles and market share, CM's relationships with its major customers and CM's potential to achieve growth. *Id.* at 23 ¶¶ 112, 113. This issue relates more specifically to scienter, which the court addresses this issue in more detail below in section III(B)(2)(ii).

Thus, Barton's complaint fails sufficiently to plead the bases for Barton's information and belief.

Accordingly, the court finds that Barton has failed to plead with particularity the falsity of defendants' statements and the bases of his information and belief and that dismissal of his complaint on this ground is warranted.

2

 Defendants argue that a further deficiency in the complaint is that it fails to allege facts that support a strong inference of scienter. Scienter is "a mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194, 96 S.Ct. 1375, 47 L.Ed.2d 668 n. 12 (1976). The Ninth Circuit has established that "plaintiffs pro-

ceeding under the PSLRA can no longer aver intent in general terms or mere 'motive and opportunity' or 'recklessness,' but rather, must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent" and that "the PSLRA requires plaintiffs to plead, at a minimum, particular facts giving rise to strong inference of deliberate or conscious recklessness." *Silicon Graphics*, 183 F.3d at 979. When the challenged statements are forward-looking, the facts must give rise to a strong inference that defendant had actual knowledge that the statement was false or misleading. *Ronconi*, 253 F.3d at 429.

■■■ Defendants contend that Barton's complaint fails to raise a strong inference of scienter because none of the four possible grounds for scienter are sufficient.

i

First, defendants argue that premising scienter on the undated discussions with unidentified Lucent representatives and other unidentified customers is insufficient. Mot. Dism. at 13:8–16. Barton alleges that defendants knew their statements to be false based on communications with Lucent and other CM customers. CC at 10 ¶¶ 62, 64. In *Silicon Graphics*, the Ninth Circuit dismissed the plaintiff's complaint in part because "it lack[ed] sufficient detail and foundation necessary to meet either the particularity *or strong inference* requirements of the PSLRA. * * * [Plaintiff] fails to state facts relating to the internal reports, including their contents, who prepared them, which officers reviewed them and from whom she obtained the information." *Id.* at 984 (emphasis added). Accordingly, the requirement of pleading with particularity applies with equal force to scienter. As defendants point out, Barton's complaint lacks any description of: (1) when and where the alleged communications took place; (2)

who was present; (3) how Barton learned what was said during such conversations; and (4) what, specifically, was said during those conversations. As the Ninth Circuit noted in *Silicon Graphics*, in the absence of such detail, it is impossible to draw the necessary strong inference regarding defendants' knowledge. Accordingly, the court finds that such alleged conversations do not give rise to a strong inference of scienter.

ii

Defendants next assert that Barton cannot adequately plead scienter by arguing that, because Gilbert and Creelman possessed senior management positions, they can be presumed to possess the requisite intent. Mot. Dism. at 13:17–14:11; see CC at 23 ¶¶ 112, 113, 23–24 ¶¶ 117–18, 28–89 ¶¶ 129–30. Barton argues that, as key officers of the company, Gilbert and Creelman can be presumed to know facts critical to the business' core operations.

It is true that some courts have found that " 'facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers.' " *In re Peoplesoft Inc Sec. Litig.*, 2000 WL 1737936, *3, 2000 U.S. Dist. LEXIS 10953, *11 (N.D.Cal.2000), quoting *Epstein v. Itron*, 993 F.Supp. 1314, 1325–26 (E.D.Wash.); see also *In re Aetna Inc. Sec. Litig.*, 34 F.Supp.2d 935, 943 (E.D.Pa.1999) (finding that knowledge of "widespread integration problems" with defendant company's recent merger could reasonably be imputed to the knowledge of the company's officers). But even courts in this district that have recognized this proposition have cautioned that "[l]ike all other circumstantial inferences, the persuasive force of each situation must be evaluated individually. Rote allegation about 'hands-on' managers and 'important' transactions should not, by themselves, be

enough to demonstrate a strong inference of scienter." *Peoplesoft*, 2000 WL 1737936 at *4, 2000 U.S. Dist. LEXIS 10953 at *11–12.

Defendants point out that a presumption about the officers' knowledge is inappropriate and has generally been rejected by the Ninth Circuit. See, e.g., *Silicon Graphics*, 183 F.3d at 985 (stating that, in the absence of specifics, there is no basis for determining whether the officers knew their statements were false); *Autodesk*, 132 F Supp 2d at 844 (rejecting plaintiff's contention that key officers should be presumed to have knowledge because such a presumption would defeat the requirement of specially pleading scienter); *Vantive*, 110 F.Supp.2d at 1218 (rejecting contention that defendants had the requisite knowledge because of their "hands-on" management style and their "interaction" with other officers and employees and characterizing such pleading as "boilerplate").

The court agrees that cases such as *Silicon Graphics* undermine the assertion that company officers may be presumed to have knowledge of certain information by virtue of their position within the company. As the courts in *Autodesk* and *Vantive* point out, such a presumption reduces pleading scienter to boilerplate assertions, which would defeat the PSLRA's requirement that scienter be pled with particularity. Thus, the court declines to speculate on Gilbert and Creelman's knowledge based on the positions they held at CM.

Even if the court were to apply the "core business" presumption, that presumption would be of little assistance to Barton here. Such a presumption applies only to facts regarding a company's "core business," and very little of the knowledge Barton would have the court attribute to Gilbert and Creelman falls in that category. While declining sales and revenue might be an appropriate category of

knowledge to attribute to key officers under some circumstances, such attribution would not be appropriate here, since Barton provides little information substantiating the details of the allegedly declining sales and revenue. And imputing knowledge of the activities, operations and plans of other companies to Gilbert and Creelman is entirely unwarranted. In *Stac*, for example, the Ninth Circuit stated that "another company's plans cannot be known with certainty. Even assuming, as we must, that [another company] had informed [defendant] that it planned to introduce [a product], [defendant] could not have known whether [the other company] would truly do so." 89 F.3d at 1399. Thus, the court agrees with defendants that corporate officers should never be presumed to know the plans of another company. See Reply Mot. Dism. (Doc. # 95) at 6:1–3.

iii

Defendants' next argument is that Barton's allegations regarding Gilbert and Creelman's desire to retain their job and prestige is insufficient to establish scienter. Mot. Dism. at 14:12–15:3; see CC at 23–24 ¶ 117. Most courts have found that such "motive and opportunity" allegations, standing alone, do not constitute sufficient grounds for alleging scienter. *Autodesk*, 132 F Supp 2d at 844 (citing *Silicon Graphics*, 183 F.3d at 979); *In re PetSmart, Inc. Sec. Litig.*, 61 F.Supp.2d 982, 999 (D.Ariz.1999). The rationale behind this limitation is that "alleging a corporate defendant's desire to retain his position with its attendant salary, or [to] realize gains on company stock, would force the directors of virtually every company to defend securities fraud actions." *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 623 (1999).

Barton argues that, while motive and opportunity standing alone may not suffice, his complaint should nonetheless sur-

vive on the basis that such motive and opportunity are coupled with highly material misrepresentations. Opp. Mot. Dism. at 15:9–15. It is true that some courts have found that motive and opportunity, when coupled with highly material misstatements or omissions pled in sufficient detail, may provide the basis for scienter. See *In re Nuko Info Systems Inc. Sec Litig.*, 199 F.R.D. 338, 343 (N.D.Cal.2000). But to make such a finding, the court would require that Barton's allegations regarding the false statements be pled with enough particularity that it would be fair to infer scienter—otherwise, plaintiffs could subvert the general rejection of "motive and opportunity" allegations merely by pleading that defendants had made material misstatements. As the court recognized previously, the allegations regarding falsity, while identifying particular categories of information that purportedly made defendants' statements false, provide little in the way of particulars about such information. In the absence of this kind of specific information, the court declines to find that defendants' motive and opportunity provide a strong inference of scienter here.

Barton also contends that the temporal proximity between a false statement and the subsequent disclosure of inconsistent information provides enough circumstantial evidence, when coupled with motive and opportunity, to support a strong inference of scienter. Opp. Mot. Dism. at 15:25–16:21. Barton relies on *Fecht v. Price Co.*, 70 F.3d 1078, 1083–84 (9th Cir. 1995), which provides that the shortness of time between a false statement and the revelation of the true state of affairs provides circumstantial evidence of falsity. See also *In re VISX Inc Sec Litig*, 2001 U.S. Dist. LEXIS 2152, *29–*30 (N.D.Cal.) (finding that temporal proximity supports an inference of falsity in some circumstances). Barton cites several statements made or issued by defendants in September and October 2000, each of which concerned CLECs and their impact on CM's potential for revenue and growth. Opp. Mot. Dism. at 16:6–21. Although such statements were made a relatively short time before CM announced on October 17, 2000, that it would not meet its revenue expectations, such statements do not provide convincing circumstantial evidence. The statements cited by Barton relate to the CLECs and whether changes in their financial health or position would affect CM. As the court explained above, it cannot be reasonably expected that one company know the plans or the effects of the financial condition of another company with certainty. *Stac*, 89 F.3d at 1399. Thus, those statements simply do not support a strong inference of scienter.

iv

■ Defendants' last argument regarding scienter is that Gilbert and Creelman's stock sales do not support a strong inference of scienter. Mot. Dism. at 15:4–17:23. To rely upon an insider's stock sales to support a strong inference of scienter, Barton has the burden to show that such sales are "unusual" or "suspicious." *Ronconi*, 253 F.3d at 435; *PetSmart*, 61 F.Supp.2d at 1000. Insider trading is unusual or suspicious "only when it is 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" *Id.*, quoting *Silicon Graphics*, 183 F.3d at 986. And some courts have found that "where an individual retained more shares that he or she sold, the resulting aggregate loss will defeat an inference of fraud." *PetSmart*, 61 F.Supp.2d at 1000. In evaluating the nature of insider stock sales, courts typically examine three factors: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's

trading history. *Ronconi,* 253 F.3d at 435 (citing *Silicon Graphics,* 183 F.3d at 986). Even if these factors reveal stock sales to be "suspicious," some courts will not infer scienter on the basis of stock sales alone. See *In re Splash Technology Sec Litig,* 2001 U.S. Dist. LEXIS 16252, *43 (N.D.Cal.) (*Splash II* ), quoting *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 206 (1st Cir.1999).

Defendants first argue that Barton fails to establish scienter based on insider trading because he fails to allege that Gilbert and Creelman's stock sales were dramatically out of line with prior sales. Mot. Dism. at 15:18–16:10. As a threshold matter, the court agrees with defendants that, because Barton's complaint does not contain detailed information concerning Gilbert and Creelman's trading practices before the class period, any allegations of scienter based on such sales are weak. Some courts have found that, in the absence of proof that sales were out of line with prior trading practices, it is impossible to discern whether stock sales would provide a strong inference of scienter. See *Dalarne Partners Ltd. v. Sync Research, Inc.,* 103 F Supp 2d 1209, 1214 (C.D.Cal.2000). In the interests of thoroughness, however, the court examines whether the trading practices were out of line with prior practice.

Both Gilbert and Creelman were subject to a "lock-up period" after CM's IPO that prohibited them from selling any stock until October 1999. See RJN, Ex. L at 62, 64–65. Gilbert sold 195,000 shares during the period from October 1999 through March 2000. See RJN, Exh. H. Although the CC states that Gilbert then sold 110,-000 during the class period (which ran from April 19, 2000, to October 17, 2000), the true figure is 150,000 shares. See RJN, Exh. I; CC at 4 ¶ 8. Creelman sold 82,750 shares of stock during the period from October 1999 through March 2000.

See RJN, Exh. J. Creelman then sold 99,-000 shares during the class period. See RJN, Exh. K. Barton does not dispute these figures.

Based on these figures, the court would be hard-pressed to conclude that Gilbert and Creelman's sales during the class period were dramatically out of line with their previous trading patterns. The sales of both Gilbert and Creelman were relatively consistent between the two six-month periods, and Gilbert and Creelman certainly did not sell significantly more stock during the class period than they did in the preceding six months. In fact, Gilbert sold *more* shares during the six months preceding the class period than he did during the class period itself.

Defendants next argue that the timing of the stock sales was not suspicious, based on several arguments: (1) 45% of Creelman's sales took place during the first few days of the class period and 53% of Gilbert's sales took place during the first six weeks of the class period—not at a time particularly proximate to the stock drop (see RJN, Exhs. I, K); (2) Gilbert and Creelman's last stock sales were in August 2000, and they sold no stock at all during the period of time following the allegedly false statements in September and October 2000 (see *id.*); (3) Gilbert and Creelman sold their stock at prices ranging from $58 to $90, below the class period high price of $125 (see *id.*; CC at 20–21 ¶ 106).

Barton responds that, with respect to the timing of the sales, the proper question is whether the defendants gained a market advantage from the undisclosed adverse information and that, despite the fact that the stock was not sold at its peak price, the value they received is still significantly greater than the value to which the stock fell. Opp. Mot. Dism. at 14:6–17; see *Ronconi,* 253 F.3d at 436 (noting that de-

fendants sold stock at a price comparable to what it was worth after the negative information was disclosed). Barton also argues that defendants engaged in a pattern of "heated trading activity" in August (not long before the negative disclosures in October), since Gilbert and Creelman collectively sold 70,000 shares in that month. Opp. Mot. Dism. at 14:18–15:7.

The court does not find that the timing of the stock sales is strongly suspicious. First, as defendants point out, Gilbert and Creelman sold comparable or greater blocks of stock during other open trading windows as they did in August 2000. See RJN, Exhs. H–K. For example, Creelman and Gilbert collectively sold 168,000 shares during the February 2000 window and 149,000 shares during the April/May window. See *id.* The so-called flurry of trading in August does not appear to be dramatically out of line with these trading patterns. Further, the temporal proximity between the August stock sales and the October disclosure, while marginally suspicious based on its timing, is not enough to raise a strong inference of scienter.

Second, the sale prices of the stock are not, by themselves, convincing evidence that the timing of the sales was suspicious. It is undoubtedly true that the sale of Gilbert and Creelman's stock during the class period caused them to reap economic benefits that they would not have realized had they sold the stock after the October 17, 2000, announcement. But the prices at which defendants sold their stock—ranging from $58 to $90—also tend to show that defendants did not calculate their sales to maximize the stock's value. Such prices, as defendants note, constitute only 43% to 72% of the stock's peak value. Had Gilbert and Creelman's sales been calculated to reap the benefits of the undisclosed information, it is likely that at least some of the stock sales would have

been at a price closer to the stock's maximum value.

With respect to the stock trading, defendants' final argument is that Gilbert's stock sales were not suspicious in amount. Mot. Dism. at 17:10–23. Defendants cite *Vantive Corp* for the proposition that, when a CEO only sells a low percentage of his stock (in that case, 13%), scienter could not be inferred. As CEO of CM, Gilbert made most of the allegedly false statements at issue. Although the parties disagree regarding the proper method of calculating the exact percentage of stock Gilbert sold, by either of their calculations, Gilbert sold only between 17% and 21% of his shares of stock. Opp. Mot. Dism. at 14:2 n. 1; Reply Mot. Dism. at 7:5 n. 6; see RJN, Exhs. H, I. Defendants also cite *Ronconi* for the proposition that selling this particular percentage of stock is not suspicious. 253 F.3d at 435 (finding that selling 17% of holdings is not sufficient to support an inference of scienter). Defendant also argues that since Gilbert retained significantly more shares than he sold, the aggregate loss defeats any inference of scienter. *PetSmart*, 61 F.Supp.2d at 1000.

With respect to Gilbert, the court agrees that the percentage of stock sold during the class period is not suspicious enough to raise a strong inference of scienter. Even assuming that Gilbert sold 21% of his holdings, the sales of such stock would, at most, support a weak inference of scienter. See *PetSmart*, 61 F.Supp.2d at 1000 (noting in passing that the sale of 20% of stock during the class period might be enough to raise an inference of scienter under certain circumstances). But 21% is not significantly greater than the 17% figure disclaimed in *Ronconi*. And the fact that Gilbert, who was the CEO of the company, retained the majority of his holdings tends to negate such an inference.

Creelman's stock, however, is another matter. According to Barton's calculations, Creelman sold more than 50% of his stock. CC at 22 ¶ 111. Selling over half of one's holdings is significantly more suspicious than selling only one-fifth of one's holdings. The 50% figure is significant also because it means that Creelman did not retain more stock than he sold. As such, the amount of Creelman's sales, standing alone, might be enough to make his stock trading suspicious.

Taken as a whole, however, even Creelman's sales are not enough to make the trading activity suspicious. As the court noted, even Creelman's sales of stock were consistent with his past trading patterns and did not occur at times that would have maximized the value of such stock. On the whole, the court cannot conclude that such stock sales were suspicious enough to raise a strong inference of scienter.

Accordingly, the court finds that Barton has failed to plead facts giving rise to a strong inference of scienter and that his complaint should also be dismissed on this basis.

### 3

Defendants' last argument is that Gilbert and Creelman's forward-looking statements are not actionable because they are protected by the PSLRA's safe harbor and because they are protected under the "bespeaks caution" doctrine. Mot. Dism. at 17:24–24:5. The Ninth Circuit has recognized that "[t]he PSLRA created a statutory version of th[e "bespeaks caution"] doctrine by providing a safe harbor for forward-looking statements identified as such, which are accompanied by meaningful cautionary statements." *Employers Teamsters Local Nos. 175 & 505 Trust Fund v. The Clorox Co.*, 353 F.3d 1125, 1131 (9th Cir.2004). Accordingly, it is appropriate to consider the two protections simultaneously.

In describing the "bespeaks caution" doctrine, the Ninth Circuit has said: "The bespeaks caution doctrine provides a mechanism by which a court can rule as a matter of law (typically in a motion to dismiss for failure to state a cause of action or a motion for summary judgment) that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud." *Clorox*, at 1132, quoting *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413 (9th Cir.1995). Under this doctrine, the court must consider whether the total mix of information in the document or conversation is misleading. *Fecht v. The Price Co.*, 70 F.3d 1078, 1082 (9th Cir.1995). In other words, the "bespeaks caution" doctrine "reflects nothing more than 'the unremarkable proposition that statements must be analyzed in context.'" *Id.*, quoting *Worlds of Wonder*, 35 F.3d at 1414. Similarly, the safe harbor created by the PSLRA protects "forward-looking statements identified as such, which are accompanied by meaningful cautionary statements." *Clorox*, at 1131; see also 15 USC § 78u–5(c). The court is required under the PSLRA to consider any statement cited in the complaint and any cautionary statement accompanying such statement in evaluating a motion to dismiss. 15 USC § 78u–5(e).

Defendants contend that a number of the statements in the complaint are immunized under the safe harbor/bespeaks caution rationale. Defendants argue that the following statements are accompanied by adequate safe harbor warnings:

- The two identified press releases—one from April 18, 2000, and one from July 17, 2000 (CC at 11 ¶ 68, 13 ¶ 82; Ramos Decl., Exhs. C, D):
 - The April 18, 2000, press release announced first-quarter revenues

and earnings, described CM's past revenues and described CM's acquisition of OnPrem, as well as the market opportunities that acquisition might present. The press release contained a "Note to Investors" warning that identified the press release as containing forward-looking statements and listing factors that might subject the information to change, such as:

- quarterly fluctuations in operating results attributable to the timing and amount of orders for products;

- the concentration of revenue in a small number of customers;

- risks related to integrating the operations and products of OmPrem Networds;

- factors affecting the rate of DSL deployment by customers; and (5) factors affecting the demand for DSL technologies.

Ramos Decl., Exh. C.

- The July 17, 2000, press release announced second-quarter revenues and earnings, characterized CM as likely to continue to be "best-of-breed" for the evolving DSL market and characterized the second quarter as a reflection of an ongoing focus on "excellence, execution, and market leadership." The press release was accompanied by essentially the same risk warnings as accompanied the April 18, 2000, press release. Ramos Decl., Exh. D.

- The three identified SEC filings—one S–1/A and two 10–Qs (CC at 12 ¶¶ 73, 75, 15 ¶ 89; RJN, Exhs. A, B, E):

 - The April 28, 2000 S–1/A states in part that demand for CM's products would "continue to grow with the use of the Internet, the proliferation of data intensive application and the proliferation of corporate network-

ing applications." CC at 12 ¶ 75; RJN, Exh. E. The S–1/A also warned that "it is difficult or impossible for us to predict future results of operations and you should not expect future revenue growth to be comparable to our recent revenue growth." RJN, Exh. E at 4. CM also specified that:

- Quarterly and annual results were likely to fluctuate significantly due to factors beyond CM's control, such as timing, amount, cancellation or rescheduling of customer orders and the economic conditions of the DSL and telecommunications markets (*Id.* at 5);

- CM's success depended upon strategic partnerships with other companies, including Lucent, which were also relatively new and which CM could not control (*Id.* at 7);

- Lucent was a large customer and was selling its own competing product, which caused CM to expect a decline in sales both to Lucent and to those customers who purchased CM equipment through Lucent (*Id.*);

- CM's primary customers were CLECs whose presence in the market was relatively new and that future orders from CLECs would depend upon those companies' ability to, for instance, raise capital and acquire new customers (*Id.* at 6).

- The two 10–Qs reported that CM expected earnings that eventually proved to be overly optimistic. CC at 12 ¶ 73, 15 ¶ 87; RJN, Exhs. A, B. The two forms contained substantially the same cautionary language as the April 28, 2000, S–1/A form.

RJN, Exh. A at 13–16; RJN, Exh. B at 14–17.

- The two identified conference calls (CC at 11 ¶ 70, 14 ¶ 84; Ramos Decl., Exhs. A, B):
 - During the April 2000 conference call, Gilbert and Creelman stated their expectations that CM would have revenue in excess of $330 million, that CM's gross margin would remain at or above 54% for 2000 and that CM expected earnings per share of $0.88–0.90 for 2000 and of $1.20–1.25 for 2001. CC at 11 ¶ 70; Ramos Decl., Exh. A. Creelman began the call by stating that the conference call contained forward looking statements, that such statements were subject to risk and uncertainty and referred listeners to CM's SEC filings for more detailed information on such risks. Ramos Decl., Exh. A at 1.
 - During the July 2000 conference call, CM again reported expected revenues of roughly $325 million and earnings per share of roughly $1.00 for 2000, as well as gross margins above 55%. CC at 14 ¶ 84; RJN, Exh. B. Creelman issued a safe harbor warning similar to the one given in connection with the April 2000 conference call. RJN, Exh. B at 1.

Defendants also argue that the following statements, although not immediately accompanied by safe harbor warnings, are protected under the "bespeaks caution" doctrine, because they were made in reasonable temporal proximity to the cautionary statements issued in conjunction with the other forward looking statements:

- The one-on-one conversations Gilbert and Creelman allegedly had following the April and July 2000 conference calls (CC at 11 ¶ 70, 14 ¶ 84), which happened in conjunction with the conference calls and the press releases issued at or near the same time (Ramos Decl., Exhs. A–D);

- Gilbert's May 29, 2000, conversation with unidentified investors characterizing CM's business as "strong" and making predictions regarding revenue and earnings per share (CC at 13 ¶¶ 78, 79), which happened in conjunction with two press releases dated May 17 and May 22, 2000, that contained detailed safe harbor warnings (Ramos Decl., Exhs. E, F);

- Gilbert's August 29, 2000, conversation with unidentified investors regarding substantially the same subjects as his May 29 conversation (CC at 15 ¶¶ 88, 89), which occurred in conjunction with two press releases dated August 21, 2000, that provided detailed safe harbor warnings (Ramos Decl., Exhs. G, H);

- Gilbert's September 22, 2000, conference statements concerning projected revenues and earnings and characterizing concerns about CM's declining share prices as unfounded (CC at 16 ¶¶ 91, 92), and CM's September 27, 2000, statement that it was comfortable with its previous earnings projections (*Id.* at 16 ¶¶ 93, 94)—both of which occurred in conjunction with press releases dated September 18 and September 25, 2000, containing safe harbor warnings (Ramos Decl., Exhs. I, J);

- The October 9, 2000, Kaufman Bros statement based upon information from Gilbert and Creelman forecasting optimistic revenues and earnings and predicting that Lucent would increase its orders in the third and fourth quarter (CC at 17 ¶ 95), which occurred in conjunction with the safe harbor warnings given near the September 22 conference and an October 2, 2000, press

release giving detailed safe harbor warnings (Ramos Decl., Exh. K);

- The October 12, 2000, interview with Motleyfool.com (CC at 18 ¶¶ 99, 100; Grauer Decl. I, Exh. I), which occurred shortly after the October 2, 2000, press release (Ramos Decl., Exh. K) and included cautionary statements (such as characterizing the market as being in transition) (Grauer Decl. I, Exh. I).

Defendants contend that, based upon the detailed safe harbor warnings issued in conjunction with or in temporal proximity to all of Gilbert and Creelman's allegedly false statements, CM had "pervasively warned investors about the precise risks that [Barton] has identified in the CC." Mot. Dism. at 24:3–5. Barton challenges this characterization on several grounds.

i

First, Barton alleges that many of the statements made by Gilbert and Creelman were not forward-looking in nature. For example, Barton argues that statements characterizing CM's business as remaining "strong," "solid" and "on track" to meet revenue and earnings expectations and that downplayed any concerns about CLECs relate to past or present facts and are not forward-looking. Barton contends that the following statements fall in this category:

- * * * [Gilbert stated,] "With the acquisition of OnPrem Networks and its complementary products for the business multi-tenant unit (MTU) market, *we feel that [CM] has a strong product set to pursue emerging MTU opportunities.*" CC [11] ¶¶ 68.
- On or about May 29, 2000, defendant Gilbert reassured investors and analysts that [CM's] business remained "*strong.*" CC [13] ¶ 78.
- Gilbert added, "During the quarter [CM] also expanded its distribution capability with the announcement of an OEM agreement with Marconi and we announced Versapoint NV as our first international customer. *Overall, Q2 reflects our ongoing focus on excellence, execution, and market leadership.*" CC [13–14] ¶ 82.
- On or about August 29, 2000, defendants Gilbert and Creelman conferred with large [CM] shareholders and securities analysts and told them that [CM's] third quarter 2000 business trends remained "*solid.*" CC [15] ¶ 88.
- [CM] was *on track* to report fourth quarter 2000 earnings per share of at least $0.29. CC [16] ¶ 92.
- [CM's] relationship with its CLEC customers was generating continuing revenue growth due to continuing strong DSL line growth. CC [16] ¶ 92.
- [CM's] shares had declined due to "unfounded" concerns about [CLECs]. CC [16] ¶ 92.

See also Opp. Mot. Dism. at 17:16–18:2 (emphasis added). Barton contends that these statements are not forward-looking in the sense intended by the PSLRA. See *In re Secure Computing Corp. Sec. Litig.,* 120 F.Supp.2d 810, 818 (N.D.Cal.2000) (finding that the statement that a company was "on track" to meet expectations is "considered as [a] statement[ ] of current business conditions" and is not forward-looking). Defendants counter that the statements to which Barton cites are alleged to be false based on future contingencies that had not yet occurred and, as such, were nevertheless forward-looking. Reply Mot. Dism. at 10:28–11:11. Defendants also argue that the safe harbor protects underlying facts and assumptions on which predictions are based and that any alleged "historical" facts that are a part of the forward-looking statements are thus protected. Id at 11:12–21.

■ The definition of forward-looking statements includes statements containing projections of revenues, income, earnings per share, management's plans or objectives for future operations and predictions of future economic performance. *Splash I,* 2000 U.S. Dist. LEXIS 15369 at \*17 (citing 15 USC § 78u–5(i)(1)(A)–(C)). Any statements of the assumptions underlying or relating to these types of statements fall within the meaning of a forward-looking statement. *Splash I,* 2000 U.S. Dist. LEXIS 15369 at \*17 (citing 15 USC § 17u–5(i)(1)(D)). In addition, a present-tense statement may qualify as forward-looking "if the truth or falsity of the statement cannot be discerned until some point in time after the statement is made." *Splash I,* 2000 U.S. Dist. LEXIS 15369 at \*17 (citing *Harris v. Ivax Corp.,* 182 F.3d 799, 805 (11th Cir.1999)).

■ Many of defendants' statements are forward-looking in that they constitute forecasts of future revenues and earnings and are predictions regarding CM's future economic performance. The statements to which Barton objects are those that pertain to CM's citation of positive business developments and CM's characterization of CM's present prospects for meeting its future projections. Barton does not allege that the past events to which defendants refer (i e, the acquisition of OnPrem or the addition of Versapoint) are false; rather, he seems to take issue with CM's characterizations that it its business was "strong" and "solid," that it was "on track" to meet future goals, that CLECs were a continuing source of revenue growth and that concerns about CLECs were "unfounded." The truth of such statements, in large part, depends upon the occurrence of future events (such as the possibility that the CLECs would curtail future business). But to the extent that such statements rested upon a characterization of the present state of the company, such statements are not properly considered forward-looking.

This conclusion, however, is of little moment. First, the vast majority of the statements identified as forward-looking by defendants involve future projections and thus *are* forward-looking. Second, several of the handful of statements that were not forward-looking (characterizations of business as "solid" and "on track") are best characterized as inactionable puffery, as the court has previously discussed. Third, to the extent that such present-tense statements are not puffery, the court has already found that Barton has failed particularly to plead either falsity or the basis for his information and belief. In any event, the court proceeds on the basis that, with the exception of the few statements identified by Barton as statements of present fact, the majority of defendants' statements were forward-looking.

ii

Barton next objects that the forward-looking statements were not specifically identified as such. Opp. Mot. Dism. at 18:23–14. Barton cites, for example, *Harris,* 182 F.3d at 803, for the proposition that a forward-looking statement must be identified with precision. But as defendants point out, courts in *Harris'* own circuit have not interpreted *Harris* as imposing such an impractical requirement:

> There is no authority in this Circuit to hold that a company must specifically identify which statements in a document are the forward-looking statements. Thus, a statement at the end of each release or filing stating generally that forward-looking statements in this release or report are made pursuant to the safe harbor provisions of the PSLRA are considered sufficient, rather than a specific labeling of each statement as forward-looking.

*In re Republic Services Sec. Litig.*, 134 F.Supp.2d 1355, 1363 n. 4 (S.D.Fla. 2001).

The court is aware of no binding authority in the Ninth Circuit that would require a company individually to identify each and every forward-looking statement in its press releases, SEC filings, conference calls and the like. And in the court's view, the conclusion reached by the *Republic Servs* court is the correct one. To saddle companies with such a duty would be impractical at best and impossible at worst. Further, as defendants point out, to impose such a requirement would void virtually every safe harbor warning issued since the enactment of the PSLRA. And such a requirement would also contravene the notion that the information in corporate announcements and disclosures is evaluated from the perspective of a reasonable investor. See *Fecht*, 70 F.3d at 1082. If the warnings given in connection with a document or other statement are adequate, a reasonable investor will have enough information to ascertain which statements are projections or are contingent upon future events.

That being said, the court must still evaluate whether the statements are adequately identified. The April 18 and July 17, 2000, press releases contained a cautionary statement at their conclusions, which is enough sufficiently to identify the press releases as containing forward-looking statements. The same is true for the three SEC filings that Barton alleges contained false statements. The conference calls are a slightly more difficult matter, since the specifics of the cautionary statements were not recited during those calls—instead, Creelman referred listeners to contemporaneous written documents. The Ninth Circuit, however, has found that an oral statement referring listeners to a "readily available written document" would sufficiently designate the conversation as containing forward-looking statements.

*Clorox*, at 1133. Thus, the conference calls are sufficiently identified.

With respect to the other statements identified by defendants as falling under the "bespeaks caution" doctrine, the court is less convinced. Defendants contend that such statements were made in close enough temporal proximity to the safe harbor warnings contained in press releases, SEC filings and conference calls that such safe harbor warnings could be extended to those statements. Defendants cite *Fecht* in support of this notion. *Fecht* states, in relevant part, that "whether a statement in a public document is misleading may be determined as a matter of law only when reasonable minds could not disagree as to whether the *mix* of information in the document is misleading." 70 F.3d at 1082 (emphasis in original). Defendants also point to a Tenth Circuit case, *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1122 (10th Cir.1997), in which the court of appeals discredited the notion that the cautionary language be contained or referenced in the same document or conversation, so long as the cautionary information is available in some other public document.

■■■ While, as a theoretical matter, it might be true that a reasonable investor would investigate information available in a public document and would attribute any warnings in such a document to other statements by the company's representatives, making such an assumption does not comport with the text of the PSLRA. The safe harbor provision of the PSLRA requires that statements be "identified as forward-looking statements" before the safe harbor protection may apply. 15 USC § 78u–5(c)(1)(A)(i). Thus, any former extension of the "bespeaks caution" doctrine to statements that make no reference to forward-looking statements likely does not survive the codification of that

doctrine in the safe harbor provision of the PSLRA.

Under this requirement, therefore, the majority of additional statements identified by the defendants are not immunized by the PSLRA's safe harbor and the "bespeaks caution" doctrine. Although many of these statements occurred within days of press releases and other filings that contained cautionary information, defendants do not contend that Gilbert or Creelman specifically cautioned that listeners should refer to those documents for appropriate cautionary warnings. Thus, it is possible that investors might see or hear such statements and, not seeing or hearing any indication that cautionary warnings exist, would not undertake the effort to read the accompanying press releases or SEC filings. The only such statements that may warrant immunization are the conference call follow-up conversations with individual investors and analysts. To the extent that the individuals who participated in the follow-up conversations also participated in the conference calls, any such individual would have heard the safe harbor warnings as part of the conference calls. Thus, any warnings given during the conference calls ought to apply to the follow-up conversations—at least with respect to conversations with individuals who participated in the corresponding conference call.

Thus, the court concludes that the statements in the press releases, SEC filings, conference calls and follow-up conversations were all identified with the requisite specificity.

### iii

■ Barton next objects that the cautionary language accompanying the statements was mere boilerplate and thus cannot be considered the type of meaningful cautionary language contemplated by the PSLRA. It is true that boilerplate language warning that investments are risky or general language not pointing to specific risks is insufficient to constitute a meaningful cautionary warning. *Splash I*, 2000 U.S. Dist. LEXIS 15369 at *32–*33. The cautionary warning ought to be precise and relate directly to the forward-looking statements at issue. *Id.* at *32 (citing *Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir.1996)). But the PSLRA does not require a listing of *all* factors that might make the results different from those forecasted. Instead, the warning must only mention *important* factors of similar significance to those actually realized. *Clorox*, at 1133; *Harris*, 182 F.3d at 807.

Turning to the statements at issue, the accompanying warnings included references to specific factors that were either the same or of similar significance to the actual causes of CM's downturn. For example, the April 2000 press release contained warnings concerning the timing and amount of customer orders and the concentration of revenue in a small number of customers. See Ramos Decl., Exh. C at 2. And the April S–1/A filing contained detailed risk warnings regarding fluctuation based on timing, amount, cancellation or rescheduling of orders, strategic partnerships with other companies (including Lucent), the fact that Lucent was introducing a competing product likely to cause a reduction in CM's sales and risks related to the financial stability of CLECs. See RJN, Exh. E at 4–7. The adequacy of such warnings would also be applicable to the conference calls, since Creelman directed listeners to CM's press releases and filings to obtain the relevant cautionary warnings. Thus, CM's safe harbor warnings were adequate.

### iv

Barton finally objects that defendants cannot "bespeak caution" when they know the statements they have made are false. Opp. Mot. Dism. at 22:3–22. Barton is

correct that "the inclusion of general cautionary language regarding a prediction would not excuse the alleged failure to reveal known material, adverse facts." *Rubinstein v. Collins*, 20 F.3d 160, 171 (5th Cir.1994). But to undercut the safe harbor analysis in this fashion, Barton must adequately show that the statements at issue were knowingly false. As discussed in some detail above, Barton has not pled falsity with the requisite precision nor pled facts giving rise to a strong inference of scienter. Thus, Barton cannot avoid, on the basis of this objection, immunization of the forward-looking statements accompanied by adequate cautionary warnings.

Accordingly, the court finds that the forward-looking statements in the press releases, SEC filings, conference calls and follow-up conversations with conference call participants are immunized under the PSLRA's safe harbor and that, to the extent Barton's CC premises liability on those statements, it must be dismissed with prejudice.

### C

The court thus finds that Barton's complaint is inadequate on three grounds: (1) Barton fails to plead the basis for his information and belief and the basis for falsity with the required particularity; (2) Barton fails to plead facts that give rise to a strong inference of scienter; (3) many of the statements upon which Barton premises liability are immunized under the PSLRA's safe harbor codification of the "bespeaks caution" doctrine. Accordingly, the court GRANTS defendants' motion to dismiss Barton's Section 10(b) claim.

### IV

In addition to arguing that Barton's Section 10(b) and Rule 10b–5 claim should be dismissed, defendants contend that Barton's Section 20(a) claim should also be dismissed. Defendants claim that, because

Barton has failed to plead a viable claim under Section 10(b), his Section 20(a) claim must also fail. Mot. Dism. at 24:7–10. Barton contends that, because his complaint states a good Section 10(b) claim, his Section 20(a) claim should also survive. Opp. Mot. Dism. at 20:25–27.

Section 20(a) provides for "controlling person liability." To establish such liability, plaintiff must show a primary violation—in other words, plaintiff must raise a good claim under Section 10(b). See, e.g., *Wenger*, 2 F Supp 2d at 1252. Thus, in the absence of a viable claim under Section 10(b), any remaining Section 20(a) claims must be dismissed. *Splash II*, 2001 U.S. Dist. LEXIS 16252 at *51, quoting *Paracor Finance Inc. v. General Electric Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir.1996); *Copperstone v. TCSI Corp.*, 1999 WL 33295869, *16–17, 1999 U.S. Dist. LEXIS 20978, *55 (N.D.Cal. 1999); *Wenger*, 2 F Supp 2d at 1252.

Because the court has concluded that Barton's Section 10(b) claim fails for all of the reasons stated above, Barton has no basis upon which to premise a Section 20(a) claim. Thus, Barton's 20(a) claim must also be DISMISSED.

### V

For the reasons stated above, the court GRANTS defendants' motion to dismiss (Doc. # 85) in its entirety. Barton's complaint is DISMISSED. With respect to the statements found to be immunized by the PSLRA's safe harbor provision, such dismissal is with prejudice. Barton may file an amended complaint remedying the pleading deficiencies identified in this order within 60 days of the date of this order.

IT IS SO ORDERED.